The action was brought for the recovery of damages for injury to the plaintiff's health, alleged to have been caused by the negligence of the defendants. The theory upon which the action is prosecuted will appear from the following summary of the plaintiff's allegations.
The Southern Power Company, a foreign corporation, is engaged in the business of producing, distributing, and selling hydro-electric power in North Carolina and other States, and the Western Carolina Power Company was created and organized as a subsidiary domestic corporation for the purpose of developing and improving the water power on Catawba River, Paddy's Creek, and Linville River, in Burke County; of impounding a reserve supply of water for initial or primary use in the production of such hydro-electric power; of regulating the flow of the water, and of supplying to the water-power plants of the Southern Power Company an increased flow during periods of drought and low water. A few years ago the defendants erected three dams approximately 125 feet in height across Catawba River, Paddy's Creek, and Linville River, thereby impounding the water, which is connected by canals across the intervening water divides so as to make one continuous body. The power station is located at the dam on Linville River. The surface area of the artificial lake thus created exceeds ten thousand acres, and the shore line when the lake is full exceeds one hundred miles; but when the stored water is drawn upon in seasons of drought, both the area and the shore line are largely reduced. The lake is intersected by a number of small streams and ravines, varying in width and extending back into the hills and mountains; and in the *Page 26 
upper reaches of the lake the water is very shallow, vast areas being only a few inches in depth. The shallow waters tend more and more to be obstructed and to become stagnant through the incessant growth of vegetation, and in the small streams and ravines connecting with the lake are depressions or sags which are flooded in seasons of high water and left stagnant when the water is low. The defendants have diverted the flow of Catawba River and Paddy's Creek into the dam on Linville River, where the water is released into the channel of Linville River, and in this way have left numerous ponds and pools of stagnant water in the unused channels below the dams. This whole region was free from malarial diseases before the dams were erected, and it was the duty of the defendants in constructing the dams and ponding the water so to prepare the area to be flooded that malarious conditions would not result; to destroy all timber growth, underbrush, and other vegetable growth upon the areas to be flooded and to keep said areas free from such growth, and to install and maintain an adequate system of drainage. The defendants negligently failed to perform their duty in these respects; negligently failed to remove the timber growth, underbrush, and other vegetable growth on the area covered by the lake; negligently failed to provide for the drainage of said area and the channels of said streams; negligently left within the area of the lake large quantities of timber growth, through the accumulation of which in the shallow waters the free circulation of the water in the upper reaches of the lake is obstructed and prevented; negligently allowed stagnant water and great quantities of vegetable matter to remain there, by reason whereof the shallow waters were shaded and corrupted and the vegetable matter left to decay. By reason of such neglect of duty an unwholesome, unhealthy, and malarious condition was set up in all the upper reaches of the lake and in the adjacent country; malaria-bearing mosquitoes are propagated in all the margins of the lake and in the ponds and pools along the channels of said streams; chills and fever and other malarial sickness became epidemic, and the entire region, noted for its healthfulness before the construction of the dams, was thereby made unhealthy and subjected to malarial infection and disease. By reason of the defendant's negligence the plaintiff has been infected with malaria and so run down in health that he is unable to do manual labor, has suffered loss of time, incurred expense, and greatly suffered in mind and body. The plaintiff's wife and children have also suffered in like manner from the same cause.
The defendants filed an answer denying all the material allegations of the complaint, and set up an alleged estoppel against the plaintiff arising out of the terms of a lease, to which reference is made in the opinion. *Page 27 
The issues were answered as follows:
1. Was the plaintiff injured by the negligent conduct of the defendants, as alleged in the complaint? Answer: Yes.
2. What damages, if any, is the plaintiff entitled to recover? Answer: $4,000.
3. If the plaintiff was injured, as alleged in the complaint, is he estopped from bringing this action by reason of the stipulations contained in the lease offered by the defendants? Answer: No.
Judgment for the plaintiff. Defendants appealed, assigning error.
The foundation of legal liability for the creation or maintenance of a nuisance is ordinarily not so much the degree of care that is used as the degree of danger that exists even with the best of care, while the ground of civil liability for negligence is injury to person or property when such injury is not the result of premeditation and formed intention. 20 R. C. L., 6. It is not essential to a disposition of the exceptions to decide whether the complaint should be regarded as based on one or both these grounds, for the theory adopted on the trial was the defendants' negligent failure to perform a legal duty which they owed the plaintiff, and one of the main defenses was the insufficiency of the evidence in any view to subject the defendants, or either of them, to any kind of legal liability. This defense the appellants presented by a demurrer to the evidence or a motion for nonsuit. Whether the demurrer should have been sustained or the motion granted we are now to determine.
The substance of the plaintiff's allegations is set forth in the statement of facts. For him it is contended in brief that the defendants' failure to exercise due care in the construction and maintenance of their works and in the ponding of the water proximately caused the spread of the infection and brought about the plaintiff's impaired health and anemic condition.
Several witnesses introduced as experts in medicine and sanitation expressed their opinion as to the types of malaria, the way in which it is contracted, its effects, and the means of prevention. The scientific theory of causation, it was said, is a microscopic parasite injected into the blood by the bite of the Anopheles mosquito. It has been demonstrated, according to the testimony, that if a mosquito of this variety bite a person suffering from malaria, and after the parasite is developed *Page 28 
in the salivary gland bite a healthy person, the latter will in due time develop malaria. The converse also is true: persons who are protected from mosquito bites escape malaria. When this organism or parasite gets into the red corpuscles of the blood it develops into a larger organism which breaks up into a number of parts, and in this way disrupts the corpuscles and turns the poison loose in the body.
There is evidence to the effect that of the three known malaria-bearing mosquitoes (Anopheles), only two are found in the region covered by the lake. These two are the Punctapennis and the Quadrimaculatus, benevolently abbreviated by the witnesses to "punc" and "quad." There is further evidence that four things are essential to the production of the disease: the Anopheles mosquito, propagation, a person infected with the parasite, and a person who is well.
This summary accentuates the pivotal question arising on the defendants' demurrer to the evidence. They say that the Quadrimaculatus breeds in ponds and lakes and the Punctapennis along the banks of running streams and in small pools adjacent to streams where the water eddies; that both species had been found along the ravines and streams now covered by the lake long before the water was impounded; that neither species has ever been found in the defendants' lake or in any place connected with their works, and that the plaintiff was infected by mosquitoes that had been propagated in streams and other natural breeding places entirely disconnected with the defendants' property. Moreover, they contend that the disease was transmitted from infected laborers who had come from malarial sections of the South to aid in the construction of the dams, and that the defendants, therefore, in no view of the evidence, caused or contributed to the outbreak of the malady.
On the other hand, the plaintiff contends that up to the time the lake was built the whole community had been free from malaria; that the first outbreak occurred in the summer of 1919 after the water had been backed five or six miles up the coves and valleys; that sporadic cases of the disease previously occurring were traceable to the victim's temporary sojourn in distant malarial regions; that before the water was ponded the Anopheles mosquito had not propagated to an appreciable extent in that part of the State, but since that time both species have been found breeding along the margin of the lake and in pools of stagnant water left open by the defendants; that the importation of labor was a negligible and uncertain factor; that the Anopheles mosquito would not have bred on the lake if the banks had been free from vegetation; that the defendant was negligent in failing to remove from the margin grass, vines, bushes, dead trees, and masses of second growth which protected the breeding places and in failing to drain or otherwise *Page 29 
protect the small bodies of water standing in and near the old channels below the dams; and that as a proximate result of such negligence the plaintiff, his wife, and their children were infected with malaria and have suffered its attendant evils.
We find in the record evidence tending to sustain each of the inconsistent theories advanced by the respective parties. Under these circumstances, we need hardly repeat the legal truism that the plaintiff is entitled to the most favorable view of the evidence and to the benefit of any circumstances it tends to establish, and that a demurrer to the evidence or a motion for nonsuit can be sustained only when the evidence in no aspect is sufficient in law to warrant a verdict for the plaintiff. The authorities to this effect are so numerous and so familiar as scarcely to call for citation. Allen v. Garibaldi, 187 N.C. 798; Hancock v.Southgate, 186 N.C. 278; Rush v. McPherson, 176 N.C. 562.
On behalf of the defendants it was argued that the plaintiff's illness may have resulted from one of several causes, for some of which, at least, they were not responsible, and that the plaintiff must fail because the evidence does not trace his ailment to the defendants' negligence. In support of this position the defendants cite Rice v. R. R., 174 N.C. 268;Cobb v. Fogalman, 23 N.C. 441; Wittkowsky v. Wasson, 71 N.C. 451; S. v.Powell, 94 N.C. 965. But the plaintiff's evidence, as indicated, was sufficient to carry the case to the jury and, if accepted, to warrant the verdict. His Honor, therefore, was correct in overruling the demurrer and declining to dismiss the action.
In the second group of assigned errors are exceptions to evidence tending to show that in 1922 and 1924 Anopheles mosquitoes were found to be breeding in the old bed of the Catawba River and at other places below the dams, and to the exhibition before the jury of a bucket of water dipped during the trial from places below the dams and, according to the plaintiff's evidence, containing Anopheles larvae. The defendants assert there is no evidence that these places existed as possible sources of breeding in 1919 or that conditions then were similar to those prevailing in 1922 and 1924. But there is evidence for the plaintiff tending to show that the condition of the old river bed was the same in 1922 as in 1919. Apart from this, however, the defendants contended throughout the trial, and repeat in their brief, "that not a single Quadrimaculatus mosquito has ever been found breeding in the defendants' lake or in any other place connected with the defendants' works"; and upon this theory, as already suggested, they based one of their principal defenses. This is shown from the cross-examination of witnesses introduced by the plaintiff prior to the time Fisher was called by the plaintiff for examination. The first witness was Dr. Long, an *Page 30 
admitted medical expert, and on the cross-examination the defendants brought out evidence from which the jury might reasonably have inferred that, in his opinion, neither the dams nor the pools of water in the old channels had provided suitable breeding places for the malaria-bearing mosquito at any time. And so with others. Upon what ground should the plaintiff be denied the privilege of combating this theory before resting his case? It is an established principle that, while one substantive fact is not usually admissible to prove another, still, where an issue is raised as to whether a given effect has been produced or can be produced by alleged causes, evidence apparently collateral is often admitted when the facts present such points of similarity as to afford reasonable data for a conclusion. Jones on Ev., sec. 164. But, without regard to this question, we learn from the record that the defendants in support of their theory offered witnesses admitted to be experts who testified that they had examined the lake for mosquitoes in 1921 and 1922, and that, while mosquitoes bred profusely on the adjacent property, they were not found on the water of the lake. So said their witness, Dr. Carter; and Dr. Le Prince testified upon the trial that there were then no "quads" in the vicinity; from which he deduced the conclusion and expressed the opinion that none were there in 1919. The plaintiff introduced Mason, Hallyburton, and Jaynes in rebuttal. Unquestionably, their testimony was competent, and that of Fisher, even if otherwise inadmissible when offered, was also competent in contradiction of the defendants' witnesses afterward introduced. These assignments, we find, cannot be sustained.
The plaintiff propounded to Dr. Rankin two hypothetical questions which, together with the answers, are made the subject of the defendants' fifth and sixth exceptions. Both questions are based upon an assumed finding of facts, the object of the first being to show the natural and probable effect of the existence of the assumed conditions upon the health of the community, and the object of the second to show whether the prevalence of malaria in the community might have been attributable to these conditions. The defendants urge two objections: (1) That the witness was permitted to express an opinion upon a vital question to be decided by the jury, and (2) that the questions assume the existence of facts which are irrelevant, immaterial, and unsupported by the evidence.
The last objection, it is true, must be considered in the light of decisions holding that it is error to admit a hypothetical question based on an assumed finding of irrelevant or unsupported facts. S. v. Holly,155 N.C. 485; Bailey v. Winston, 157 N.C. 252; Dameron v. Lumber Co.,161 N.C. 495; Brewer v. Ring, 177 N.C. 476. But we do not admit the defendants' premise that the hypothetical statement is either *Page 31 
irrelevant or unsupported. As to this objection, it will be seen that the questions clearly assume the conditions relied on as existing in the year 1919, when the plaintiff was stricken, as well as in the two years next following; and if these conditions prevailed in 1919, whether or not they continued, would in no wise impair the strength of the plaintiff's contention that they were a potent factor in producing his illness. It was not incumbent on the plaintiff to include in his questions all the evidence bearing upon the fact to be proved; the defendants had the right to present other phases of the evidence in counter-hypothetical questions. S. v.Stewart, 156 N.C. 636; S. v. Holly, supra. Certain clauses in the questions are pointed out which the defendants insist have no basis in the evidence; but as we read the record there is evidence tending to support each of the clauses thus referred to. Those in the first question are abundantly sustained, and as to the clause in the second question particularly adverted to, it will be observed that the specific question was addressed to the "responsibility or degree of responsibility," if any, of the assigned conditions, and the witness was unable to answer this question. No motion was made to strike out any part of his explanatory remarks that may have been deemed unresponsive. Hodges v. Wilson,165 N.C. 323; Wacksmuth v. R. R., 157 N.C. 34.
The first objection also is without merit. In answer to the first question the witness expressed his opinion upon a matter of science or skill in his profession, not upon the existence or nonexistence of any ordinary circumstances to be determined exclusively by the jury. "There is a rule of evidence which excludes, on the ground of superfluity, testimony which speaks to the jury on matters for which all the materials for judgment are already before the jury. This testimony is excluded simply because, being useless, it involves an unnecessary consumption of time and a cumbersome addition to the mass of testimony. In the majority of instances the testimony thus excluded will consist of an `opinion' by the witness — i.e., a judgment or inference from other facts, as premises, and it will be excluded because the other facts are already or may be brought sufficiently before the tribunal. If they are not or cannot be, then the witness' judgment or inference will be listened to. Thus, it will often depend on the special qualifications of the witness whether he can add anything valuable which the jury have not already for themselves. When, for example, the size and appearance of a skull-fracture has been testified to, the witness, if he is a person of only ordinary experience, cannot tell any better than the jury can whether the fracture is such as to have necessarily caused death; while, if he is a medical man, he is capable of adding considerably to the jury's information on that point. In the former case, his judgment, or `opinion,' would be excluded; in the latter case, it would be listened to." Wigmore *Page 32 
on Evidence, sec. 557. It is upon this principle that opinion evidence is admitted, but in admitting it the courts are vigilant to see that the province of the jury shall not be invaded, and to this end exclude, as far as possible, any inference or conclusion as to the ultimate fact in issue. Application of the rule is made in Nance v. R. R., 189 N.C. 638; Hill v.R. R., 186 N.C. 475; Smith v. Comrs., 176 N.C. 466; Kerner v. R. R.,170 N.C. 94; Mule Co. v. R. R., 160 N.C. 253; Deppe v. R. R., 154 N.C. 523. But it is not an inflexible rule, and it is frequently relaxed in the admission of evidence as to ultimate facts in regard to matters of science, art, or skill, as may be seen by reference to Holder v. LumberCo., 161 N.C. 177; Ferebee v. R. R., 167 N.C. 290; Barrow v. Ins. Co.,169 N.C. 572; Moore v. Ins. Co., 173 N.C. 532, and to many other cases.
The vital question submitted to the jury on this phase of the evidence was embraced in the first issue, but the witness drew no inference from the testimony and merely expressed his professional opinion upon an assumed finding of facts by the jury. S. v. Bowman, 78 N.C. 509; S. v. Cole,94 N.C. 958; Summerlin v. R. R., 133 N.C. 554; Brewer v. Ring, supra;Raulf v. Light Co., 176 N.C. 691. We must, therefore, overrule exceptions 5, 6, 8, 9, and 10, which are grouped under assignments 3 and 7.
The defendants called R. V. Michaux as a witness and asked him this question: "Do you know of any cases of malaria up in that country (the Bridgewater section of Burke County) prior to the time the work was started on this dam?" The plaintiff's objection was sustained on the ground that the question did not limit the area inquired of to one mile and a half of the plaintiff's residence. The witness would have answered that he had personal knowledge of such cases. The defendants excepted to the exclusion of the evidence and to a similar ruling of the court in connection with the proposed testimony of other witnesses. These exceptions (15, 16, 17, 18, 20, 23, 24) are classed in assignments 4 and 8.
The defendants say this evidence was admissible as tending to disprove the facts assumed in the hypothetical question put to Dr. Rankin and to impeach the contention that the impounded water had caused the plaintiff's illness. Under ordinary circumstances, the excluded evidence would have been competent (S. v. Hightower, 187 N.C. 300), but the question is whether the defendants are in position to take advantage of the exceptions.
After several of his witnesses had testified that malaria had never broken out in the community before the dams were built, the plaintiff offered to prove the condition of the lake, the old channels, and the Linville valley after the water had been impounded. The defendants *Page 33 
objected, and insisted that the evidence should be confined to conditions near the plaintiff's dwelling. This objection and others of similar character were sustained. The plaintiff afterwards called Dr. Houck, an expert witness, and asked him this question: "What would you say as to the prevalence of malaria during the period of your practice in Burke along the Catawba River in the section under consideration? Are you able to state whether malaria was prevalent in these valleys, in these sections, prior to the impounding of the water of Lake James?" The defendants objected unless the question were confined to a distance not exceeding one mile and a half from the place where the plaintiff lived — the distance which, according to all the evidence, is the radius of a mosquito's flight. This objection also was sustained, the plaintiff contending that he, therefore, had to abandon the further examination of the expert on whom he chiefly relied. After the defendants had thus circumscribed the plaintiff's evidence, they excepted because the trial judge refused to relax in their favor and for their benefit the very rule they had invoked against the plaintiff. There is a marked similarity in the questions asked by the respective parties, and if incompetent for the plaintiff, the excluded evidence was likewise incompetent for the defendants. In fact, it is hardly probable that the defendants really hoped to destroy the ruling under which they had sought and secured protection. Greene v. Ruffin, 179 N.C. 345. Afterwards, however, they introduced other witnesses who testified that cases of malaria had been known there before the dams were built, and thus received the full benefit of this evidence. In our opinion, they have no just cause of complaint under these conditions.
The proposed testimony on behalf of the defendants that there was an epidemic of malaria in Rutherford County in 1919 and none near a pond on Tom's Creek, four or five miles from Lake James, was properly excluded. (Assignments 5, 6.) In what way it could have thrown any light on the controversy or aided the court or jury is not readily perceptible. It was entirely too remote. There is a fundamental postulate of evidence that circumstances which are irrelevant to the existence or nonexistence of the disputed facts are not admissible. The proposed testimony embodied neither an evidential nor an ultimate fact. Deming v. Gainey, 95 N.C. 528;Southerland v. R. R., 106 N.C. 100; Short v. Yelverton, 121 N.C. 95;Geer v. Water Co., 127 N.C. 349.
The plaintiff was permitted to prove by Dr. Butt, when recalled, that in June, 1924, he had found Anopheles mosquitoes near the upper end of the defendants' lake and at other places more remote. (Exceptions 78, 91.) This evidence was admitted in rebuttal of Dr. Boldridge, who had previously testified as an expert for the defendants. He had said that in September, 1921, and again a year later he had made an investigation *Page 34 
to determine whether mosquitoes would breed on Lake James; that malaria-bearing mosquitoes did not breed there in 1919; that he had come to this conclusion from his examination; that he had looked over the entire area of the lake and had yet to find his first "quad"; that the "punc" would not breed there — the former being a "pond breeder" and the latter a "stream breeder"; that he had examined practically all the streams or branches emptying into the lake and that virtually all seemed to be producing the "punc"; that he had examined the streams below the Catawba dam in the fall of 1922 and 1923, near the plaintiff's house, and, in his opinion, mosquitoes were breeding there in 1919; that he had found pools along the old river bed, but that Anopheles mosquitoes would not breed in foul or scum water, or in water containing iron in soluble form.
For the purpose of contradicting these statements, Dr. Butt was permitted to testify that he had found Anopheles mosquitoes breeding on the still waters of the lake and in the branches and other places; also that the water dipped by another witness from pools in the old river bed contained Anopheles larvae.
The defendants contend that the evidence should have been restricted to a compass of one mile and a half from the plaintiff's house; but after the judge's ruling on the question, Dr. Boldridge, at the instance of the defendants, testified that his investigation included the entire area of the lake and places outside or beyond it. If the evidence in chief was material for the defendants, was not the evidence in rebuttal material for the plaintiff? So much of it as tended to show the finding of larvae in June, 1924, was admissible in contradiction of the defendants' evidence that mosquitoes would not propagate where the larvae were found. We are of opinion that the evidence excepted to was competent in contradiction of the defendants, if not competent in its relevant bearing upon the questions involved in the first issue. Gaylord v. Respass, 92 N.C. 554; Clark v.Guano Co., 144 N.C. 64; Pool v. Anderson, 150 N.C. 624.
On 17 March, 1919, the plaintiff leased from the Western Carolina Power Company, one of the defendants, for a period ending on the first day of the following December, twenty-five acres of land situated a short distance below the Catawba dam, "solely for agricultural purposes." The lease contained the following agreement: "It is mutually agreed that the lessee shall take the premises subject to the right of the lessor to back or flood the waters of the Catawba and its tributaries upon said land hereby leased, and shall hold the lessor harmless from any and all claims or damages growing out of the backing or ponding of said waters, or the construction, maintenance, or operation of the dam or dams at or near Bridgewater. It is understood and agreed that *Page 35 
the lessor shall have the right to enter and occupy all of said lands or any part of same at any time it may see fit, and that in case of such entry the lessor will pay to the lessee such actual damages as shall be caused to the crops of the lessee by reason of such entry or occupation."
The trial judge instructed the jury as a matter of law that this agreement did not estop the plaintiff from prosecuting his action, and that the answer to the third issue should be "No." The tenth assignment calls in question the accuracy of this instruction. (Exceptions 94, 96.)
The defendants contend that the plaintiff's cause of action is for damages alleged to have been sustained by reason of their negligence in ponding and diverting the water of three streams; that it is, therefore, covered by the terms of the lease which stipulates against any and all claims growing out of the backing or ponding of the waters, and that they contracted with the plaintiff, not against negligence in the performance of a legal duty, but against the initial assumption of any such duty. To sustain this position the appellants cite a number of cases. Several of them simply enunciate the principle that in the absence of express stipulation the landlord is under no obligation to keep the leased premises in repair, but obviously these cases are not decisive of the point raised by the exceptions under consideration. Fields v. Ogburn, 178 N.C. 407;Improvement Co. v. Coley-Bardin, 156 N.C. 255; Duffy v. Hartsfield,180 N.C. 151; Hudson v. Silk Co., 185 N.C. 342. In the other cases cited it is held in substance that a common carrier while performing its duties to the public cannot contract against its negligence, but if the public has no interest in the contract or in the property affected by it, such contract may not be void as against public policy. Slocumb v. R. R., 165 N.C. 338;Hartford Ins. Co. v. R. R., 175 U.S. 91, 44 Law Ed., 84; R. R. v. Voight,176 U.S. 498, 44 Law Ed., 560; Robinson v. R. R., 237 U.S. 82, 59 Law Ed., 849; Wells-Fargo Co. v. Taylor, 254 U.S. 175, 65 Law Ed., 205. In the first of these cases it appears that Slocumb leased from the railroad a strip of land on which he erected a building for business purposes; that the railroad constructed a siding on the leased premises for Slocumb's use and benefit, and that it was agreed by the parties that any fire originating within the boundaries of the leased property should not be chargeable to the railroad. A spark escaped from a locomotive and started a fire which destroyed the lessee's property. He brought suit and impeached the validity of the stipulation exempting the railroad from liability. In the case of the Hartford Insurance Company the circumstances were similar. In each case the question was whether the contract was against public policy. In the latter it is said: "The authorities all agree that a contract is not void as against public policy unless it is injurious to the interests of the public or contravenes some *Page 36 
established interest of society. . . . The defendant owed no duty to the public to exercise care with respect to its own buildings situate on its right of way and incurred no liability for their negligent burning unless the fire spread beyond its own premises." To the same effect is the decision in Slocumb's case, the Court approving Elliott's statement, "We think that ordinarily a contract exempting a company from liability for negligently burning property not on the right of way or premises of the company would be held void." In Voight's case the question was whether he could avoid his agreement that the railroad company should not be responsible to him for injuries received while occupying an express car as a messenger by invoking the principle of public policy, which forbids a common carrier of passengers for hire to contract against responsibility for negligence; and it was held that he was not a passenger. In Robinson'scase and in Taylor's practically the same principle was upheld.
We have reviewed these cases for the purpose of showing that they are not inconsistent with the instruction given in reference to the third issue. As we understand the lease, it involves neither public policy nor the right to contract; the agreement must be construed as it is written. The land was rented solely for agricultural purposes and the lessor reserved the right to enter and occupy all or a part of it at any time upon paying the lessee the actual damages done the crops by reason of such entry or occupation. The lessee took the land subject to the lessor's right to flood it, and bound himself to pay the stipulated rent, notwithstanding injury to the land by flood or other external cause. Improvement Co. v.Coley-Bardin, supra. To forestall the lessor's liability in case it caused damage to the leased premises by flood or otherwise, there was inserted in the agreement a clause exempting it from such liability by releasing all claims and damages growing out of the ponding of the water or the construction, maintenance, or operation of the dams. So, construing the lease in its entirety, we think it manifest that the parties intended merely to provide against the lessor's actual invasion by flood, entry, or otherwise, of the plaintiff's possession or right of possession during the term of his lease, and did not contemplate the lessor's exemption from liability for the creation outside the leased premises of such unsanitary conditions as might result in a nuisance or might seriously impair the plaintiff's health. To adopt the defendants' construction of the agreement, we apprehended, would be equivalent to saying that in the construction of their works the defendants owed no duty to the public; but if 75 or 80 per cent of all the people living in the community suffered in like manner with the plaintiff, as it is claimed, this fact would seem to indicate not only that the public was concerned, but that the agreement (under the decisions in the case of *Page 37 
Slocumb and in that of the Hartford Insurance Company) might give rise to a serious question of public policy.
The plaintiff's action is not based upon an actual invasion of his possession or proprietary rights, creating a liability from which the lessor would be released by the agreement or upon the mere impounding of the water. It is based upon the negligent failure of the defendants to exercise due care with respect to the construction and maintenance of the lake for the protection of the plaintiff in the enjoyment of his legal rights. The stipulated release, therefore, does not bar the present action, as his Honor correctly held, and for this reason the exception to the directed instruction upon the third issue must be overruled.
We find
No error.