(No. 5380. January 18, 1930.)

STATE, Respondent, v. WARD OTIS THARP, Appellant.

[284 Pac. 201.]

Porter & Taylor, for Appellant.

W. D. Gillis, Attorney General, and Fred J. Babcock, Assistant Attorney General, for Respondent.

638

T. BAILEY LEE, J.—On September 26, 1928, defendant, Tharp, with his family was residing at the west end of a private road southwest of Twin Falls. Seven hundred and thirty-five feet east was the house of the Rose family, and 487 feet farther on was that of the Bowens. On various occasions for some two years prior to this date there had been trouble between the Tharp and Rose families, the defendant and his family claiming that Mrs. Rose had threatened to shoot one of the Tharp boys, and that defendant had been advised that Rose was carrying a gun for him. Likewise, subsequent to the fall of 1927, there had arisen a series of troubles and bickerings between the Tharp and Bowen families, the children continually fighting, and, as was alleged, Bowen was represented as carrying a gun for the defendant.

On the morning in question it was recited that the Rose children and Waletta Bowen encountered the Tharp boys on the way to school, and had a fight in which defendant participated, striking the Rose and Bowen girls with a pick handle; this conduct of the defendant was denied by him and his boys. Shortly thereafter, while on his way home in a truck, and opposite the Bowen residence, it appeared that defendant was halted by the Bowens, some of whom were in the road and the others just inside the fence. He got out, in his hand a loaded revolver.

The state's story was that he fired at Bowen, then turned and proceeded a few steps to the head of the truck where, it is alleged, Mrs. Bowen was standing, fired one shot into her hip, and, as she turned toward the fence in an attempt to support herself, fired two more shots into her body, one striking her heart, causing immediate death. Thereupon, Bowen grappled with defendant and, assisted by the children, got the gun from him, the defendant in the struggle having been more or less severely beaten.

Opposed to this is the picture drawn by defendant. After reciting that Bowen, Mrs. Bowen and Waletta were in the road, throwing up their hands and ordering him to stop, he testified as follows:

"Why, I looked down at the Rose place for a minute or so, and took the situation in. I saw this Miss Rose down there in the road with a shotgun, and I couldn't figure out just what was up; and I stepped out of the truck and I walked around the truck and past Miss Bowen; this here Bowen he says, 'Damn you, right here is where we fix you,' and when he said that he reached for his hip pocket; he didn't more than reach his hip pocket until I jerked my gun out and I shot at Bowen right over his head, and I made one other shot, and when I shot that shot we clinched, and I took Bowen—I grabbed—changed hands with the gun and took Bowen right across there, right over the head, or rather, on that side (indicating). . . . .

"Q. Just describe to the jury, now, how the gun was handled by you and Bowen. A. Well, I held to the gun and I had hold of the barrel and all the rest of them was ahold of it, and I was ahold of the barrel, and Bowen—this girl was holloing to him to put it on my breast, and he got that gun on my breast twice and I jerked the barrel up; and then they had it against the side of my head, right there (indicating), and was trying to pull it off there and I pushed it away from there, and that gun shot up over me. Hell! They were doing the shooting; I wasn't."

He further testified that in the *mêlée* he did not see Mrs. Bowen at all and that, as he later proceeded home-

ward, Mrs. Rose whom he had theretofore seen coming out of her house with a shotgun fired at him as he passed.

■ The defendant having been informed against for murder in the first degree, plead self-defense and hereditary insanity. From a judgment of conviction, carrying life imprisonment, he has appealed. His first three specifications of error have to do with the court's refusal to give three proffered instructions on the issue of self-defense. The court fully and properly instructed abstractedly on this particular defense, although it was unnecessary to do so. That defense was wholly eliminated, when the defendant having voluntarily taken the stand testified that the only shot he fired was in the direction of Bowen, and that whatever further shooting was accidental, or, as by him explosively described: "Hell! They were doing the shooting; I wasn't."

Defendant charges that the court erred in refusing to instruct that the burden was upon the state to prove defendant's sanity, and cites in support thereof *State v. Shuff*, 9 Ida. 115, 72 Pac. 664. We do not understand that the case so holds. On page 125 of the opinion (72 Pac. 667), the court expressly observed:

"It must be borne in mind, however, that the plea of insanity is always brought into the case by defendant and the prosecution is placed at a disadvantage to procure evidence to rebut the plea."

■ There is a wide distinction between rebuttal and proof in the first instance. A defendant's plea of insanity is ineffectual until backed by evidence; and, not until he has submitted substantial proof, is there any burden upon the state in that regard whatever.

Quoting from Bouvier, vol. 1, p. 809, the court went on to say:

" . . . . the *onus* is first on the prisoner to show that insanity exists, which being done, it immediately shifts upon the prosecution, and it is for it to show that insanity does not exist, or, if it does, that it is not such as would prevent him from knowing and doing right."

Such in substance is the rule announced in 30 C. J. 143.

What the court actually held in *State v. Shuff, supra,* was the following:

"The defendant on his own motion brings the question of insanity into the case, and it devolves upon him to create a reasonable doubt in the minds of the jurors as to his responsibility at the time of the homicide. If he fails to do this the prosecution may rest on the legal assumption that all men are sane and responsible for their acts. If, on the other hand, he does succeed in creating a reasonable doubt in the minds of the jurors as to his sanity at the time of the commission of the homicide, he is entitled to the benefit of such doubt at the hands of the jurors, and the responsibility of overcoming such doubt shifts to the prosecution."

Evidently with this language in mind, the trial court gave Instruction No. 35, complained of as error: there was no error. Nor was there error in permitting state's witness, Dr. Pointer, to occupy a seat near the jury-box. As far as the record is concerned, he was, while so seated, innocent of any comment, communication or gesture that might have influenced any juror. Defendant earnestly contends that there was error in the court's overruling his objections to the hypothetical questions propounded by the state to the witnesses Pointer and Williams, the objections being that the full field of relevant evidence had not been incorporated. Nothing else appearing, these objections may or may not have been well taken. In *State v. Crowe,* 39 Mont. 174, 102 Pac. 579, 18 Ann. Cas. 643, the court said:

"The authorities appear to be practically unanimous in holding that a hypothetical question need not embrace all of the evidence respecting the defendant's mental condition. In *Davidson v. State,* 135 Ind. 254, 34 N. E. 972, the Supreme Court of Indiana, in considering the identical question now before us, said: 'As to the second objection it would seem to be sufficient to say that it was not necessary that the hypothetical questions propounded to the witnesses

should embrace all the facts proven upon the particular subject under investigation. In the examination of expert witnesses counsel may embrace in his hypothetical question such facts as he may deem established by the evidence; and, if opposing counsel does not think all the facts established are included in such question, he may include them in questions propounded on cross-examination. Any other course would result in endless wrangles over the question as to what facts were, and what facts were not, established.' "

But, on cross-examination of the witnesses, all the omitted areas of evidence were covered; and each witness had the opportunity to, and did express his opinions consequent thereupon. This cured whatever defect the original questions might have been subject to. (*Johanson v. Huntsman,* 60 Utah, 402, 209 Pac. 197; *Lindsay Land & Live Stock Co. v. Smart Land & Live Stock Co.,* 43 Utah, 554, 137 Pac. 837, 839; *Godfrey v. Western Carolina Power Co.,* 190 N. C. 24, 128 S. E. 485; *State v. Crowe, supra; De Sandro v. Missoula Light & Water Co.,* 52 Mont. 333, 157 Pac. 641; *Gay v. Gay,* 183 Ky. 238, 209 S. W. 11; *Schaff v. Shepard,* (Tex. Civ. App.) 196 S. W. 232.)

Specification of error No. 10 not having been discussed in the brief will not be considered. Lastly, defendant insists that "the evidence of the defendant was sufficient to raise a reasonable doubt as to the sanity of the defendant, and that the prosecution failed to introduce any material evidence to the contrary." Very material evidence was the person and conduct of the defendant, himself. They were before the jury; and his recitals and observations announced from the witness-stand evidently convinced every member thereof that defendant's mental processes had no difficulty in distinguishing between right and wrong. The uncontradicted testimony of the deputy sheriff who made the arrest was that defendant declared to him: "I had to do it, I had to protect my family." Why such a statement, if not for palliation of conscious guilt? Under these considerations and in view of the further evidence supplied by the state's ex-

pert witnesses, we are not prepared to say that twelve disinterested men should have become invested with reasonable doubt. Judgment affirmed.

Givens, C. J., and Budge and Varian, JJ., concur.