494 P.2d 574

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Donald D. MYERS, Defendant-Appellant.**

**No. 10733.**

Supreme Court of Idaho.

March 10, 1972.

McDermott & McDermott, Pocatello, for defendant-appellant.

W. Anthony Park, Atty. Gen., Martin R. Ward, Deputy Atty. Gen., Boise, and Hugh C. Maguire, Jr., Pros. Atty., Pocatello, for plaintiff-respondent.

SHEPARD, Justice.

Defendant-appellant Myers appeals from a judgment of conviction entered following a jury trial and verdict of guilty of the crime of lewd and lascivious conduct with a minor child under the age of sixteen. We affirm the judgment of conviction.

The evidence of the prosecution need not be reviewed herein. It is sufficient to say that it was completely uncontradicted by the defense. The evidence of the prosecution consisted largely of the testimony of the prosecuting witness (the thirteen year old stepdaughter of Myers) and her brothers and sisters who either observed the attempted sexual assault or were in the family home at the time in question. The only evidence tendered by the defense touched upon the sanity of the defendant.

■ Defendant-appellant first complains that the testimony of the prosecuting witness, his stepdaughter, was not adequately corroborated. The record is clear that the direct eyewitness testimony of the brother of the prosecuting witness and the indirect evidence of the surrounding circumstances, together with an admissionary statement by the defendant, furnished adequate corroboration of the testimony of the prosecuting witness.

■ This court has previously held that corroboration of the prosecuting witness in a case of this type may be by direct evidence or by evidence of surrounding circumstances where, as in the case at bar, the reputation of the prosecutrix for truth and chastity is unimpeached and her testimony is not contradictory nor inconsistent with the admitted facts of the case, nor inherently improbable. State v. Ross, 92 Idaho 709, 449 P.2d 369 (1968); State v. Tope, 86 Idaho 462, 387 P.2d 888 (1963).

■ Defendant-appellant next asserts that he did not receive a fair or impartial trial, citing that two of the jurors trying the instant case had been among those called for a panel in a prior trial upon the same complaint. That prior trial ended in a mistrial. The appellant argues that, even though the two jurors in question were excused from the first trial, they were nevertheless "exposed to the facts of the case." The record demonstrated, however, that no challenge was made by trial counsel for the defendant to the seating of the two jurors in question. The record further indicates that of the jurors drawn, only four were excused upon their voir dire. Appellant had ample opportunity to challenge the two jurors in question if he believed them to be in fact prejudiced or biased. Such opportunity to challenge was not exercised and defendant will not be heard to complain at this level. Appellant has in no way demonstrated that the two jurors in question were in fact "exposed to the facts of the case" nor that they had in any way received improper knowledge of the purported facts of the case. The failure of the

defendant-appellant to exercise his right to challenge indicates a satisfaction with the jury as finally constituted. State v. Bitz, 93 Idaho 239, 460 P.2d 374 (1969).

■ Defendant-appellant next assigns error in the refusal of the trial court to allow a jury view of the scene of the crime. I.C. § 19–2124 provides in pertinent part:

"When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body * * *."

In State v. Kleier, 69 Idaho 491, 495, 210 P.2d 388, 391 (1949), the court stated:

"The record shows the physical condition at the scene of the crime had changed. Under these circumstances, the court did not abuse its discretion by denying the application."

In the instant case the record demonstrates ample testimony indicating that the physical condition of the scene of the crime had been changed in the interim between the criminal act and the jury trial, and no valid observation of that scene so changed could have assisted the jury in its determinations. Under such circumstances it is clear that the discretionary authority of the trial court was not exercised erroneously in denying defendant's motion for a jury view.

Defendant-appellant's last and principal assignment of error asserts that the jury ignored the instructions of the trial court relating to the defense of insanity. Appellant asserts that the defense "evidence" on the question of sanity of the defendant was in no way contravened by the prosecution and therefore required a finding of not guilty. The testimony on behalf of the defense consisted largely of two witnesses. One of those witnesses had worked for some years in the field of psychology and considered himself an expert in the field of psychological testing. He indicated that he had administered a battery of psychological tests to defendant a number of months aft-

er the date of the alleged offense. That witness was asked "from these tests that you gave Mr. Myers in September of 1969, with a reasonable medical certainty, can you tell us what the state of mind of the defendant was on June 24, 1969 [the date of the alleged offense]?" The witness answered "No, I can't do that." Thus, regardless of the qualifications or lack thereof possessed by that witness, and regardless of his tendered so-called psychiatric evaluation, his entire testimony was valueless since it did not relate, nor could it relate, to the state of mind of the defendant at the time of the offense.

The second witness to testify on behalf of defendant was a physician employed at a state hospital. These were the sole credentials advanced on behalf of that witness to qualify his testimony as expert in the field of psychiatry. He was not shown to be educated or to possess any experience in the field of psychiatry. Nevertheless, he stated that he had arrived at a psychiatric diagnosis of the defendant and suggested that the defendant was suffering from "marital maladjustment, [and] habitual excessive drinking" which he defined as "the patient could have been intoxicated for the past twelve months more than twelve times." He also suggested that the defendant was suffering from "depressive neurosis" which was brought on by "habitual excessive drinking."

At the time of cross-examination that witness acknowledged that during the time the defendant was under observation, pursuant to court order, at State Hospital South, the witness had recommended that the defendant be returned to court to face the charges against him rather than being retained at the hospital for treatment. The recommendation by the witness to the trial court was couched in the language of the then standard of the State of Idaho for determining the sanity of a defendant in a criminal trial, to-wit: that the defendant knew the difference between right and wrong and was able to appreciate the significance of his acts and was competent mentally to assist his counsel at trial. At the time of trial that witness had rather obviously changed his opinion as to whether or not the defendant should be held responsible for his acts. At trial the witness stated his diagnosis of the defendant as being insane in terms of the then changed standard for determining the sanity of a defendant as defined by this court in State v. White, 93 Idaho 153, 456 P.2d 797 (1969).

The above cited and quoted testimony of the witnesses for the defense evidently was completely disregarded by the jury in arriving at its verdict. The appellant contends "that the evidence established a reasonable doubt as to his sanity at the time of the alleged commission of the acts with which he was charged." Defendant further asserts that the evidence of the defense witnesses was competent and unrefuted by the State's evidence and that the jury was not at liberty to disregard that testimony and in fact that the verdict of the jury is not supported by the evidence since a reasonable doubt of the sanity of the defendant had been raised and not controverted.

In this state, once the sanity of the defendant has been "put in issue," the state must prove that sanity beyond a reasonable doubt. State v. White, *supra*. Other jurisdictions hold:

(i) That the showing of insanity is in form an affirmative defense, and must be shown by the defendant by a preponderance of the evidence;

(ii) That the defendant must prove his insanity beyond a reasonable doubt [*see*, e. g.: Leland v. Oregon, 343 U.S. 790, 72 S. Ct. 1002, 96 L.Ed. 1302 (1952)]. The approach chosen in this jurisdiction is the most protective of the defendant, and the least rigorous on him in terms of proof. *See* generally: 17 A.L.R.3d 146.

Among jurisdictions holding to the "reasonable doubt" burden on the state, there is a further split as to the quantum of evidence necessary to rebut the presumption of sanity and "put in issue" the question of sanity so that the burden of proof is on the

state. A number of federal courts and a very small minority of the states have held that "some" evidence is sufficient to rebut the presumption. Some of those courts use the terms "slight" or "any" evidence. (*But see*: Hartford v. United States, 362 F.2d 63 (9th Cir. 1966), cert. den. 385 U.S. 883, 87 S.Ct. 174, 17 L.Ed.2d 110 (1966), wherein "substantial" evidence was required). However, the application of these terms has been neither clear-cut nor uniform, and has not been as liberal towards the defendant as a first reading of the terms themselves might suggest:

> "The subject matter being what it is, there can be, of course, no sharp quantitative or qualitative definition of some evidence. 'Certainly it means more than a scintilla, yet, of course, the amount need not be so substantial as to require, if uncontroverted, a directed verdict of acquittal.'" Hawkins v. United States, 114 U.S.App.D.C. 44, 310 F.2d 849, 851 (1962).

■ Many courts have held that the presumption of sanity is not rebutted until the defendant's evidence has raised a reasonable doubt of his sanity. *See*: 17 A.L. R.3d 146. These jurisdictions therefore require that the defendant show proof sufficient to raise that doubt initially before requiring the state to bring forth further evidence to dispel that doubt. The law of Idaho regarding the burden on the defendant to rebut the presumption of sanity has been unchanging and well-stated.

> "A defendant's plea of insanity is ineffectual until backed by evidence; and, not until he has submitted substantial proof, is there any burden upon the state in that regard whatever." State v. Clokey, 83 Idaho 322, 335, 364 P.2d 159, 167 (1961).

> "[Approving an instruction that read as follows] This presumption of sanity prevails only until a reasonable doubt is cast upon it. The presumption of sanity merely relieves the prosecution from introducing proof that the defendant was sane, until that issue is raised by evidence creating a reasonable doubt as to the sanity of the accused." State v. Iverson, 77 Idaho 103, 109, 289 P.2d 603, 606 (1955).

> "And, further, a defendant's defense of insanity in a criminal case is ineffectual until backed by evidence, and not until he has submitted substantial proof, sufficient to raise a reasonable doubt, is there any burden upon the state in that regard." State v. Gould, 55 Idaho 588, 597, 44 P.2d 1114, 1117 (1935).

> "The defendant on his own motion brings the question of insanity into the case, and it devolves upon him to create a reasonable doubt in the minds of the jurors as to his responsibility at the time of the homicide. If he fails to do this, the prosecution may rest on the legal assumption that all men are sane and responsible for their acts. If, on the other hand, he does succeed in creating a reasonable doubt in the minds of the jurors as to his sanity at the time of the commission of the homicide, he is entitled to the benefit of such doubt at the hands of the jurors, and the responsibility of overcoming such doubt shifts to the prosecution." State v. Tharp, 48 Idaho 636, 641, 284 P. 201, 202–203 (1930); State v. Shuff, 9 Idaho 115, 72 P. 664 (1903).

Following State v. White, *supra,* the Idaho legislature enacted Chapter 31, Session Laws 1970, which took effect on February 19, 1970, and is now encoded as I.C. §§ 18–207 et seq. I.C. § 18–209 provides:

> "(1) Mental disease or defect excluding responsibility is an affirmative defense.
> * * *"

I.C. § 18–207 states:

> "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

> "(2) As used in this act, the terms 'mental disease or defect' do not include an

abnormality manifested only by repeated criminal or otherwise anti-social conduct."

I.C. § 18–208 states:

"(1) Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense. * * *"

Neither these, nor the remaining sections of the act contain any language which indicates any intent by the legislature to change the case law above quoted. The statement of the legislature that insanity is an affirmative defense indicates that the burden of raising and proving that defense is still upon the defendant. Indeed, it is perhaps more stringent in its burden upon the defendant-appellant.

We next turn to the status of expert opinion in the law of Idaho.

"Expert opinions are not ordinarily conclusive but are generally advisory in character to assist the triers of fact to understand and apply other evidence." Application of Big Lost River Irrigation District, 78 Idaho 591, 595, 307 P.2d 788, 790 (1957).

and

"Whether a witness is sufficiently qualified as an expert to state an opinion is a matter which is largely within the discretion of the trial court. After this determination is made and the opinion evidence is admitted, the weight of the evidence is a matter for the jury." Bean v. Diamond Alkali Company, 93 Idaho 32, 35, 454 P.2d 69, 72 (1969); Legg v. Barinaga, 92 Idaho 225, 440 P.2d 345 (1968).

As previously noted, there was considerable justification for the jury to hold the "expert" opinion in this case to be of little or no value. As was stated in Dusky v. United States, 295 F.2d 743, 757 (8th Cir. 1961):

"There is nothing essentially sacred or untouchable in expert testimony. The mere fact that the primary evidence on one side may be typified as expert in character while that on the other is exclusively from the mouths of lay witnesses and from lay facts must not of itself serve to destroy the jury's traditional function."

In State v. Bishop, 260 A.2d 393, 398 (Vermont 1969):

" * * * it is for the jury to determine from the testimony whether such experts have sufficient skill to render their opinion of any importance."

In State v. Schantz, 98 Ariz. 200, 403 P.2d 521, 524 (1965):

" * * * the jury was not compelled to accept the uncontradicted opinion testimony of an expert * * *."

In State v. Cano, 103 Ariz. 37, 436 P.2d 586, 590 (1968):

"Expert-opinion testimony is merely evidence to be considered by the jury, together with all the facts and circumstances of the case [Citation omitted]. Such testimony is no more than a learned man's opinion, and as such it can rise no higher than the validity of the reasons and facts on which it is based. * * * 'The jury should be free to make an independent analysis of the facts on which the expert's opinion rests, and thus exercise their historic function of passing on the credibility of the witness.'" (Quoting in part from Bowker v. State, 373 P.2d 500 (Alaska 1962)).

And in Tarter v. State, 359 P.2d 596, 600 (Okl.Cr.1961):

"Their verdict [the jury] is not supported by the medical proof, but only by that of a few lay witnesses on the question of insanity at the time of the shooting. Nevertheless, it was within their province to believe the testimony of the lay witnesses to the disregard of the medical testimony, if they chose to do so. The law makes no distinction in weighing evidence between expert testimony and evidence of other character, and it is for the jury and not the reviewing court to determine the weight to be given such evidence."

One of the more striking decisions in the area of nonconclusiveness of psychiatric testimony is that of People v. Wolff, 61 Cal.2d 795, 394 P.2d 959 (1964). Therein the Court upheld a murder conviction of a fifteen year old boy charged with killing his mother in the face of the testimony of four admittedly well qualified psychiatrists, all of whom testified that the defendant was suffering from schizophrenia and was legally insane. The court therein stated that the jury's verdict could be upheld on the basis of the conduct and declarations of the defendant and that resolving the conflict between such admittedly lay testimony as contrasted with expert psychiatric opinion testimony "is a question of fact for the jury's determination." Albeit that California's test of legal sanity is different than Idaho's, that decision is highly persuasive herein.

As pointed out in *Wolff,* if psychiatry were an exact science with regard to uniformity of theories, diagnoses and conclusions among its practitioners, there could be more of a rationale for making such opinion testimony binding upon the jury. Such does not appear to be the case and much of the literature in the field indicates deep-seated conflict between the various practitioners. *See*: Leland v. Oregon, *supra*; "The Promise of Psychiatry: Hopes and Disillusionments," 57 N. W. University Law Review 19; "Expertise and the Post Hoc Judgment of Insanity or the Antagnostician and the Law" 57 N. W. University Law Review 4; Carl Menninger, Address to the Tenth Judicial Circuit Conference as reported in 32 F.R.D. 481; "Psychiatry and Criminal Responsibility," 65 Yale Law Journal 761; "Psychiatry, Ethics, and the Criminal Law," 58 Columbia Law Review 183; "From M'Naghten to Currens and Beyond," 50 Cal.Law Review 189; "The Etiology and Epidemiology of Schizophrenia," 47 American Journal Public Health 1071; "Sense and Nonsense in Psychology," H. J. Eysenck (1951); "A Critique of the Psychiatric Approach to Crime and Correction," 23 Law and Contemporary Problems 650.

Since the jury in this case could have, and obviously did, reject the opinion testimony of the defendant's "experts", the only question remaining is whether there was competent evidence on which the jury could have based their determination of sanity. The record is replete with testimony regarding the conduct, actions and reactions of the defendant prior to, and immediately following, the commission of the charged act, at the time of his apprehension, and during his confinement. The defendant had been observed for long periods of time, since he had been well known to the police for a number of years. On the morning following the offense, he was found by the police drinking beer in a tavern in a jovial mood, and apparently normal in almost every respect. He was observed immediately following the commission of the offense by the step-children in the family home, and his actions and attitude were described by their testimony.

■ Finally, we note that the trial court's instruction to the jury No. 27 stated:

"Duly qualified experts may give their opinions on questions and controversy at the trial. To assist the jury in deciding such questions the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they find it to be entitled. *The jury may, however disregard any such opinion,* if it shall be found to them to be unreasonable." (Emphasis supplied)

No objection to that instruction was made at the time of the trial, nor does the appellant herein assign such instruction as error. As above indicated, this instruction was, and is, in compliance with the law of this jurisdiction.

The judgment of conviction is affirmed.

McQUADE, C. J., and DONALDSON, J., concur; SPEAR, J., sat but retired prior to opinion.

McFADDEN, Justice (dissenting).

This Court in State v. White, 93 Idaho 153, 456 P.2d 797 (1969), in a unanimous opinion, adopted as a standard for criminal responsibility the rule set forth in 1962 by the American Law Institute's Model Penal Code. In that case this Court approved four of the instructions given by the trial court which set out the standards of the Institute's code. At the time of the second trial of this case, which commenced on May 21, 1970, the legislature had enacted S.L.1970, Ch. 31, which provided

"*Section* 1. (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(2) As used in this act, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

\* \* \*."

This particular act contained an emergency clause and it became effective upon its approval on February 19, 1970.

In the instant case the trial court instructed the jury in conformity with the standards set out in State v. White, *supra,* and S.L.1970, Ch. 31, as follows:

## "No. [14]

" 'The law presumes that all men are sane and responsible for their acts. In this case, the defendant has interposed the defense of insanity. The law does not place upon [him] the burden of proving beyond a reasonable doubt that [he] was insane at the time the act charged was committed, but only places the burden upon [him] to raise in your minds a reasonable doubt as to the sanity of the defendant at the time of the commission of the act alleged in the information. If you have such doubt, then this reasonable doubt must be resolved in [his] favor and you must acquit [him]

of the crime charged.' " (Quoted from State v. White, *supra,* 93 Idaho at 155, 156, 456 P.2d at 799.)

## "No. [15]

" 'The defendant has interposed insanity as a defense. The law presumes that a defendant is sane. This presumption is rebuttable. Where evidence has been introduced that a defendant suffered a mental disease or defect at the time of the commission of the crime charged, the State must prove beyond a reasonable doubt that the defendant did not have a mental disease or defect or that, despite some mental disease or defect, [he] had substantial capacity both to appreciate the wrongfulness of [his] conduct and to conform [his] conduct to the requirements of the law.' " (Quoted from State v. White, *supra,* at 93 Idaho 155, 456 P. 2d 799.)

## "No. [16]

" 'Insanity as used in these instructions means a mental disease or defect which causes lack of substantial capacity either to appreciate the wrongfulness of one's conduct or to conform one's conduct to the requirements of law.' " (Quoted from State v. White, *supra,* at 93 Idaho 155, 456 P.2d 799.)

The defendant presented two witnesses who testified as to his mental capacity. One of these witnesses, a clinical psychologist who practiced in a local community health center, testified that in September, 1969, Myers was suffering from a psychotic disorder which he classified as a mental disease. However; this witness testified that his diagnosis was not comprehensive enough for him to have an opinion as to the mental capacity of the defendant on June 24, 1969, the date of the alleged crime.

The other witness, Dr. Liong, was qualified as an expert medical witness. He testified that he graduated from medical school and was employed at the State Hospital South, having worked there for about a year. In fact, it must be pointed out that

the state made no challenge to Dr. Liong's qualifications. He testified to his general duties at the hospital:

"My general duties include admitting patients by referrals from private doctors, psychiatrists, and also court referrals from the court or from judges all over Idaho, and also examine, diagnose patients before psychiatric consultants and treat these patients whenever necessary physically and psychiatrically, and also confer with other doctors regarding treatments, examinations and diagnosis. * * *."

Dr. Liong testified that he had examined Myers on September 30, 1969, that Myers had previously been admitted to the State Hospital in November, 1967, and also in February, 1969. He stated:

"Q. Now, in February of 1969 was Mr. Myers admitted to the hospital?

A. Yes, he was admitted the 24th of February, 1969.

Q. Do you know when he was released on this visit?

A. He was released on the 4th of March but involuntarily and was treated subsequent to that.

Q. Do you know what is [sic] diagnosis was on this visit?

A. This diagnosis was chronic paranoid schizophrenia together with excessive habitual drinking."

A motion was made to strike the last answer by the doctor, but the trial court denied the motion on the basis that the testimony came from the official records of the hospital.

During further examination of Dr. Liong, he testified:

"Q. Now, Doctor, when you treated Mr. Myers on the 30th of September, 1969, did you have an opportunity prior to treating him to go through his records at the hospital?

A. Yes.

Q. Is this general procedure before you examine a patient, to become familiar with his background?

A. Yes.

Q. Now, in your professional opinion, when you examined Mr. Myers in September, 1969, was he suffering from a mental disease or defect or disorder?

A. Yes.

Q. What was this?"

An objection based on remoteness was interposed to this last question which was sustained. After further discussion the witness was asked:

"Your answer to whether or not he was suffering from a metal disease or defect in June of 1969 is yes, is this correct?

A. Yes.

*        *        *        *        *        *

Q. So you reached this conclusion from many sources, then, is this correct?

A. Yes, that's correct.

Q. Now, in June of 1969 what was Mr. Myers' mental disease defect, in your opinion?

A. The opinion was concurred by four members of our ward team—

Mr. Kisling: I will object to that inasmuch as the ward team isn't here.

The Court: He may answer.

The Witness: The diagnosis consists of three things: depressive neurosis, marital maladjustment, and habitual excessive drinking, alcoholism.

Q. Now, is depressive neurosis what you would classify as a mental disease or defect?

A. I classify it as one of the mental defects.

*        *        *        *        *        *

Q. Now, Doctor, on the depressive neurosis and marital maladjustment and alcoholic blackouts, things of this nature that you testified to, could this cause a lack of substantial capacity or cause one to have a lack of substantial capacity to conform his conduct to the requirements of the law?

A. Yes, I think he would have that

Q. [by prosecutor] May I enter an objection? Did you say you think not or do you know certainly?

A. In this patient I know for certain that he is.

Q. [defense counsel] You know for certain what, Doctor?

A. That he has lack of capacity substantial enough to recognize his requirements or to conform with the requirements of the law.

Q. Would this be in June of 1969?

A. Yes."

The state did not offer any direct evidence contrary to the statement of Dr. Liong. Instead, the state relied on its cross-examination to weaken Dr. Liong's opinion.[1] In the cross-examination of Dr. Liong, the state presented in evidence exhibit A, a copy of an official three-page State Hospital South Evaluation and Discharge Summary concerning Mr. Myers, dated October 16, 1969, and signed by Dr. Liong.

That document contained the following paragraph which the state claimed at trial to be inconsistent with Dr. Liong's testimony.

"RECOMMENDATIONS: Since the patient knows right from wrong, knows the nature of his charges and can aid counsel in his defense, and it is our opinion that he knew these things at the time of the alleged crime, and since he left the hospital on unauthorized absence, thereby indicating that he was not motivated for treatment, it is recommended that he be returned to the court to face the charges against him rather than to the hospital."

As I read the record, however, the oral statements of Dr. Liong were never contradicted by the state. The above excerpt from the Evaluation and Discharge Summary contains one phrase relevant to the rational processes of Myers at the time of the incident, i. e., that Myers knew right from wrong at the time of the alleged crime. However, this conclusion would not overcome the doctor's testimony for the reason that the test for criminal responsibility of State v. White and the statute is a two-part test. Dr. Liong unequivocally stated that Myers was unable to conform his conduct to the requirements of law. The written report does not comment on this aspect of the test, but relates only to the prior M'Naghten test and to the defendant's capacity to stand trial and aid in his own defense.

It is my conclusion that exhibit A had no probative value as to the issue of whether the defendant had overcome the presumption of sanity. As stated in Instruction No. 14, "The law does not place upon him [the defendant] the burden of proving beyond a reasonable doubt that he was insane at the time the act charged was committed, but only places the burden upon him to raise in your minds a reasonable doubt as to the sanity of the defendant at the time of the commission of the act alleged in the information." Under the state of the record at that time the sole issue was as to whether or not the defendant had submitted evidence sufficient to overcome the presumption of sanity. The only competent evidence then before the jury was Dr. Liong's testimony to the effect that the defendant lacked sufficient mental capacity to conform his conduct to the requirements of law. (State v. White, *supra*.)

Under the law as set forth by this Court in State v. White, it is my conclusion that the defendant overcame the presumption of his sanity by the unrefuted testimony of Dr. Liong, and the state then failed to "prove beyond a reasonable doubt that the

---

1. The state's case in chief focused on the question of what factually occurred on June 24, 1969. There is in the record testimony by the police detective who arrested Mr. Myers the day following the incident to the effect that defendant appeared in a good mood and was not depressed. This observation cannot be accorded much weight in light of the fact defendant was arrested in a bar and had been drinking for a time before the arrest.

defendant did not have a mental disease or defect or that, despite some mental disease or defect, [he] had substantial capacity both to appreciate the wrongfulness of [his] conduct and to conform [his] conduct to the requirements of the law." State v. White, Instr. No. 10, 93 Idaho at 155, 456 P.2d at 799.

Under State v. White, *supra*, the effect of the presumption of sanity of a defendant disappears as a rule of law when positive evidence establishes the defendant's insanity. IX Wigmore on Evidence § 2491 (3d ed. 1940); I Wharton's Crim.Evid. § 96 (12th ed. 1955). The defendant's burden under Idaho's insanity rule is to credibly raise the issue of his lack of mental capacity which he accomplished here. As a matter of logic, if credibly raising the issue causes the presumption of sanity to disappear then the defendant must, in effect, have also raised a reasonable doubt as to his mental capacity. The legal theory is to this effect. Phillips v. United States, 311 F.2d 204 (10th Cir. 1962).

Once the defendant succeeds in offering definite evidence as to his lack of mental capacity, and thus in effect "shifting the burden," he is not required to go further.[2] The state, in my view, errs in its position that the jury is privileged to disbelieve the unrefuted expert testimony which dispelled the presumption of the defendant's sanity. Defendant's witness' testimony bears only on the presumption of sanity—the reasonable doubt. Once that is done the state must come forward with additional evidence bearing on the issue. If not, the "burden" is in reality a fiction and the jury as here would have heard no evidence on point supporting its verdict. A criminal conviction in such a circumstance requires more. In re Dennis, 51 Cal.2d 666, 335 P. 2d 657 (Cal.1959); People v. Hari, 30 A. D.2d 1046, 294 N.Y.S.2d 759 (App.Div. 1968), Phillips v. United States, *supra*.

It is my conclusion that there is merit in the defendant's position that the jury wholly disregarded the court's instructions in this case, and that the judgment in this case should be reversed.

2. It has long been the law in Idaho that once a defendant raises this issue of insanity the prosecution must then prove the defendant sane beyond a reasonable doubt. State v. Shuff, 9 Idaho 115, 72 P. 664 (1903); State v. Wetter, 11 Idaho 433, 83 P. 341 (1905).