436 P.2d 586

**STATE of Arizona, Appellee,**

v.

**Frank Vega CANO and Armando Luis Lopez, Appellants.**

**No. 1707.**

Supreme Court of Arizona.

In Banc.

Feb. 1, 1968.

**38**

Darrell F. Smith, Atty. Gen., Gary K. Nelson, Asst. Atty. Gen., for appellee.

Sheldon Stern, Phoenix, for appellant Cano.

Tupper, Skeens, Rapp & Morris, by Edward Crehan Rapp, Phoenix, for appellant Lopez.

McFARLAND, Chief Justice.

Frank Vega Cano and Armando Luis Lopez, hereinafter referred to respectively as Cano and Lopez, were charged, tried, and found guilty of the crime of murder in the first degree, in violation of A.R.S. §§ 13–451 and 13–452. Both defendants were sentenced by the Superior Court of Maricopa County to serve a term of imprisonment for life in the Arizona State Prison. From the verdict and judgment of conviction, they bring this appeal.

Armando Luis Lopez and his cousin and co-defendant Frank Vega Cano were aimlessly driving around the Phoenix-Glendale-Sun City area of Maricopa County on the evening of August 3, 1965. They were driving Lopez's mother's automobile, the driver at all times being Cano, as Lopez had no driver's license. At this time Lopez was seventeen years of age and Cano nineteen. They had some beer in the automobile, part of which had been consumed during the course of the evening.

As they drove out Grand Avenue at approximately midnight of August 3, 1965, defendants stopped at the corner of 111th Avenue and Grand so that Lopez might telephone a girl. While Lopez was making the telephone call, Cano broke into a Chevron service station and removed a number of new tires, seat cushions, and several cans of oil. Lopez then helped Cano load these articles into the car.

Evidence was later presented to show that defendants then left, only to return a few minutes later to retrieve a partially empty bottle of beer which had been left on the premises. They had been there only a very short time when a Youngtown reserve police officer, Herman W. Nofs, arrived at the scene. Officer Nofs was driving a plainly marked police car and was in uniform. He drew his pistol and approached defendants, asking them where they obtained the tires and other articles. Cano then attacked Officer Nofs, striking the gun from his hand, and beating him severely about the head and face with the officer's own blackjack. Lopez picked the

gun up from the ground and handed it to Cano who fired several shots into the victim's back. Evidence was presented to the effect that Lopez also fired one or more shots. The two defendants then returned to the car and drove away, taking the gun and blackjack with them. A second police vehicle proceeded to follow them, and a high-speed chase ensued, which resulted in defendants' driving the vehicle off the road and into a ditch, after which they fled on foot. Later that morning they were apprehended at the home of Mrs. Lopez, hidden in a large box of clothing.

Defendants were tried and convicted in a joint trial; and have perfected a joint appeal to this court. However, other than the facts and circumstances of the crime itself, the grounds on which the appeals are based have nothing in common. For this reason we will treat the appeals separately in this opinion, dealing with that of defendant Lopez first.

### Armando Luis Lopez

The first five questions presented by defendant Lopez relate to the exculpatory statements and the written confessions of defendant. After Lopez and Cano were apprehended by officers, Sergeant Ezequiel Calles handcuffed them and while in the police car taking Lopez to the Sheriff's Office told him he had a right to a lawyer. Sergeant Calles further testified that they placed Lopez in one of the interrogation rooms. Lopez testified at the hearing on the voluntariness of his confession, and at this time he testified in regard to the events at the time of the crime and did make some statements regarding it. This initial conversation took place in the presence of Sergeant Amos Falls and Sergeant Calles and without the presence of any of Lopez's family or the juvenile probation officer. The next statement was at 11:00 a. m. before Sergeant Falls and Sergeant Calles of the Sheriff's Office, Richard Cawley, a juvenile probation officer, and Blake Willis, a deputy Maricopa County Attorney, Sergeant Calles having previously called the probation officer requesting his presence.

Cawley told Lopez at the time that he was entitled to a lawyer, that he did not have to give a statement, and that any statement he did give could be used against him in a court of law. Also, Calles told Lopez specifically to cooperate and tell the truth. Subsequent to this interrogation there was a confrontation of the two defendants in the presence of Sergeant Falls, Sergeant Calles, a Sergeant Felix, Deputy Sheriff James Alandar, Deputy County Attorney Willis, and Cawley. At this time defendant Cano related his story of the evening's events which implicated circumstantially Lopez in firing one of the shots. As a consequence of this Lopez said to Cano in Spanish, "Don't say that, you are going to get me in a lot of trouble." To this Cano said, "Don't you remember that's the way it happened?" Lopez was also quoted as saying at the time that it was a police officer that had been shot, and further he hated cops anyway.

At approximately 2:00 p. m. another interrogation took place before Sergeants Calles and Falls, Virginia Martell, secretary for the Sheriff's Office who took down the proceedings in shorthand, and the probation officer Cawley. This resulted in the confession (Exhibit 31) which was signed by Lopez. This was in the presence of Deputy Sheriffs John Pennick and William Ward and Mrs. Martell. The probation officer Cawley was not present at the time of the signing. The court ruled that it would not permit the introduction of any admissions made prior to the time that the probation officer Cawley was called in, nor any oral confessions or admissions, but permitted the exculpatory statements made at the 11:00 a. m. confrontation between Cano and Lopez and the written confession.

Lopez was then put in the custody of juvenile authorities of Maricopa County. The court appointed counsel to represent Lopez. Cawley was also assigned by the court as probation officer to conduct a preliminary inquiry. On August 1, 1965, it

was recommended that Lopez be remanded to the proper authorities or handled as an adult. The court then remanded Lopez to the adult authorities for prosecution.

■ The main question presented as to the admissibility in evidence of exculpatory statements and written confession is covered by the recent decision of this court, State v. Maloney, 102 Ariz. 490, 433 P.2d 625, in which we said:

"As we see it, an inculpatory statement obtained by the police while the child is within the jurisdiction of the juvenile court is part of the evidence gathering function of that court. The fact that such evidence was never offered to the juvenile court in a hearing to adjudicate whether the child is delinquent does not alter the fact that such an inculpatory statement is evidence. In addition, as we noted above, the court in Harling [Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961)] impliedly stated that admissions obtained by the police while the child is within the jurisdiction of the juvenile court is evidence gathered in the 'juvenile proceedings.'

\* \* \* \* \* \*

"One of the underlying policies of the Juvenile Court Act is to separate the juvenile process from the criminal procedure. Such a policy is necessary to enhance the rehabilitative program of the juvenile court. We hold as a matter of 'fundamental fairness', and because § 8–228, subsec. B, 2 A.R.S., prohibits the use of such evidence, that inculpatory statements made by a child while under the jurisdiction of the juvenile court and before that court waives its jurisdiction, cannot later be used against the child in a subsequent criminal proceeding unless he and his parents are advised before questioning not only of the child's right to counsel and privilege against self-incrimination, but also of the possibility that he may be remanded to be tried as an adult."

■ The facts of the Maloney case, supra, and the instant case are similar in that both the exculpatory statement and the written confession were made before Lopez was remanded to adult authorities for trial; hence, they were made while he was within the jurisdiction of the juvenile court. Lopez's parents were not advised of his right to counsel before the questions and of his privilege against self-incrimination, or of the possibility that he might be tried as an adult. Hence the exculpatory statement and written confession, under the holding of this court in State v. Maloney, supra, were not admissible.

There are other questions raised in regard to their admissibility, but it is not necessary to pass on them.

■ Counsel for Lopez further contends that the court improperly instructed the jury in regard to burglary and intoxication. However, an examination of the case reveals the evidence was sufficient to justify instruction on this subject. The conviction of defendant Lopez is reversed and remanded for new trial.

### Frank Vega Cano

Defendant Cano has limited his appeal to the presentation of one major question. Did the State of Arizona sustain its burden of proof in its efforts to rebut Cano's defense of legal insanity at the time of the commission of the act?

■■ This court has recently reaffirmed the rule that once insanity is an issue, the burden of the state is to establish the converse beyond a reasonable doubt. State v. Martin, 102 Ariz. 142, 426 P.2d 639. The fundamental American concept—that a person charged with a crime is presumed innocent until all the elements of the crime have been proved beyond a reasonable doubt—has in this manner been extended to the common-law doctrines of legal insanity as a defense. This does not mean, however, that the state must go to such lengths in every case wherein defendant has entered a plea of insanity, for in order to cast this burden on the state, defendant must establish this defense by a showing of facts. In State v. Schantz, 98 Ariz. 200, 403 P.2d

521, this court set forth defendant's duty in this respect as follows:

> "'[T]o establish a defence on the ground of insanity, *it must be clearly proved that,* at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.'" [Italics ours.] 98 Ariz. at 207, 403 P.2d at 525, quoting from Queen v. M'Naghten, 4 St. Tr. (N.S.) 847.

In the instant case, there is no doubt that sanity was an issue to be presented to the jury, as Cano presented testimony of three psychiatrists, all of whom stated that at the time of the commission of the act Cano did not know the nature and quality of his act and that he did not know that what he was doing was wrong.

The three doctors—Dr. Richard Duisberg, Dr. Paul Bindelglas, and Dr. Harrison Baker—were all practicing psychiatrists, and were well qualified in their field. Their testimony was substantially similar in all material respects and was based almost exclusively on information supplied by defendant Cano and their observations of him during visits to the Maricopa County Jail. Each doctor visited defendant separately, the visits taking place from four to six months after the crime. Dr. Baker visited defendant Cano twice; the other doctors only once. The visits were relatively short in duration, lasting approximately an hour.

The doctors testified to defendant Cano's background and mental state in arriving at their opinion. Evidence was presented to the effect that Cano had been subjected to a very unhappy childhood. He came from a very large and very poor family; he had suffered beatings and been forced to work in the fields at the age of six; he had been neglected and otherwise mistreated by his mother's "common-law husband," Fidencio Valdez. These experiences resulted in a suppressed feeling of hatred toward Valdez. The doctors testified that at the time of the commission of the act the combination of circumstances, including the effect of a few beers, the spotlight from the police car, and the presence of the officer with a gun in his hand, had such an effect on Cano's mind that these suppressed feelings came to the fore. His condition was alternately described as being "blind with rage and panic," "a precipitative reaction of a mild cerebral irritability," and as a "disassociative reaction with a transient psychotic break with reality." The condition was described as temporary, lasting no more than a few minutes at most.

The state offered the testimony of Dr. Carl Breitner, a psychiatrist, in rebuttal. Dr. Breitner testified that in light of defendant Cano's personality makeup, the lack of any previous history of mental aberration, and the limited opportunity for examination, any expression of opinion of legal insanity at the time of the commission of the act must necessarily be pure conjecture. Dr. Breitner himself would express no opinion in this regard, and the state did not produce any expert testimony that defendant was legally sane at the time of the commission of the act. At the close of the state's presentation of its case in rebuttal, defense counsel moved for a directed verdict of acquittal. This motion was denied, as was a subsequent motion for judgment notwithstanding the verdict.

Defendant Cano contends most strenuously that where expert testimony of insanity has been presented—as in the instant case—then the state has a duty to present positive expert testimony of legal sanity in order to sustain its burden of proof. We are unable to agree with this contention. Expert-opinion testimony is merely evidence to be considered by the jury, together with all the facts and circumstances of the case. State v. McCabe, 251 Minn. 212, 87 N.W.2d 360. Such testimony is no more than a learned man's opinion, and as such it can rise no higher than the validity of the reasons and facts on which it is based. In Bowker v. State,

Alaska, 373 P.2d 500, the court, in passing on the same contention, said:

> "We shall not adopt a rule which would treat. medical testimony as conclusive merely because it is not disputed by other medical testimony. The jury should be free to make an independent analysis of the facts on which the expert's opinion rests, and thus exercise their historic function of passing on the credibility of the witness. If we were to follow Douglas [Douglas v. United States, 99 U.S. App.D.C. 232, 239 F.2d 52] and accede to defendant's argument that the jury was not competent to pass on her mental condition because of Dr. Cheatham's testimony, we would be transferring the jury's function to the psychiatrist and substituting a trial by experts for a trial by jury."

See also Dusky v. United States, 8 Cir., 295 F.2d 743.

■ The law has not yet been able to develop a perfect standard by which legal responsibility for crime is to be determined. See State v. Schantz, supra. It is for this reason that the function of the jury becomes of even greater importance in cases where insanity is raised as a defense. In United States v. Pollard, D.C., 171 F.Supp. 474, the court stated the basis for this reasoning as follows:

> " 'The psychiatrist merely expounds on the theoretical and clinical aspects of the problem. The jury evaluates his testimony, as it does the evidence on every other factual issue. That is the correct disposition, for the question whether society should assess punishment for criminal conduct is, in the last analysis, a moral judgment. The jury, being of the community, reflects its attitudes and speaks for it.' [1]

> "The wisdom of this approach is readily apparent. The opinions of experts, testifying as to the degree of responsibility of which the accused may be capable in view of possible mental disease, are, after all, nothing more than theories which are adopted to explain and account for a given act or course of conduct. Eminent psychiatrists have recognized that 'the best psychiatry is still more of art than of science', Sullivan, 'Psychiatry', 12 Encyl. Soc.Sci. 578, 580; that wide gaps in knowledge exist; that the validity of psychiatric theory can not be determined with scientific certainty. There is still comparatively little known about causes, let alone effective remedies, and the experts are not yet agreed on basic definitions. Nor can it be ignored that not only is there disagreement among experts, but that some psychiatric doctrines, once considered authoritative, are now rejected. The mystery of human behavior still remains to be solved. These reflections do not deny the value of expert testimony but leaves it to its proper place in the trial of a case."

■ The test of insanity is different in the federal courts, but the problem of judicial resolution of what is essentially a moral question is the same. Therefore, this court will uphold the jury's verdict where the State has presented sufficient evidence so that the jury might reasonably entertain a theory of the case resulting in belief in defendant's sanity beyond a reasonable doubt. State v. Ganster, 102 Ariz. 490, 433 P.2d 620.

In the instant case there was no previous history of mental aberration or abnormal conduct. Defendant Cano took the stand and related his version of the incident. From his own testimony it was abundantly clear that immediately before and after the act he not only knew the nature and consequences of his act, but that he was very much aware it was wrong. All of his actions were normal in that they might be expected of a person apprehended at the scene of a felony. Cano's childhood was quite unfortunate, but it was no worse than that suffered by a large number of

---

1. Quoting from an address by Justice William O. Douglas, reprinted in 41 Iowa Law Rev. 485, 489.

people, of whom very few have become legally insane. Even this testimony did not go uncontradicted, as Fidencio Valdez denied having mistreated Cano in his youth.

Aside from the doctors' testimony, there is nothing in the record which would support a conclusion of insanity. The effect of this testimony has been greatly weakened by the facts and circumstances brought forth in the evidence and by the testimony of Dr. Breitner. If the jury chooses to attach little weight to this testimony that is its province.

The conviction of defendant Cano is affirmed.

UDALL, V. C. J., and STRUCKMEYER, BERNSTEIN, and LOCKWOOD, JJ., concur.