557 P.2d 176

The STATE of Arizona, Appellant,

v.

Thomas Alden ALLEN, Appellee.

No. 2 CA–CR 800.

Court of Appeals of Arizona,
Division 2.

Sept. 27, 1976.

Rehearing Denied Nov. 4, 1976.

Petition for Review Denied Nov. 30, 1976.

Bruce E. Babbitt, Atty. Gen. by Heather Sigworth, Asst. Atty. Gen., Tucson, for appellant.

Debus, Busby & Green, Ltd. by Jordan L. Green, Phoenix, for appellee.

OPINION

HOWARD, Chief Judge.

When the defendant in a criminal case presents a psychiatrist who testifies that the defendant was suffering from a mental disease or defect at the time of the crime and therefore did not know the difference between right and wrong, and the state does not present psychiatrists to rebut this

testimony, must the defendant be found not guilty by reason of insanity? That is the issue to be decided in this case.

Defendant-appellee (hereinafter defendant) was tried by a jury in the Gila County Superior Court on three counts of assault with a deadly weapon and one count of first degree murder. The defenses were insanity and self defense. At the close of all the evidence defendant moved for a directed verdict contending that there was no state's evidence to rebut the defendant's lay and expert opinion evidence of insanity and therefore reasonable doubt of defendant's sanity rose as a matter of law. The court found the state offered no evidence of sanity, but nevertheless submitted the issue of guilt to the jury. However, the court also said that if there should be a guilty verdict, it would be set aside as contrary to the evidence.

The jury found defendant guilty of two counts, and not guilty of one count, of assault with a deadly weapon, and on the homicide count, guilty of voluntary manslaughter. Defendant thereupon moved pursuant to Rule 20, Rules of Criminal Procedure, for a judgment of acquittal, the grounds being the state's failure to rebut the defense's insanity evidence. The court took the motion under advisement and subsequently issued its order setting aside the jury verdict and entered a judgment adjudging the defendant not guilty by reason of insanity. It based its order on the state's failure to rebut "creditable . . . lay and expert testimony offered by the defendant demonstrating a prior psychiatric problem and treatment, as well as insanity on the night in question."

On June 17, 1975, the Gila County Attorney filed a petition for special action in the Arizona Supreme Court alleging, inter alia, that the trial court had abused its discretion in taking the Rule 20 motion under advisement in contravention of the language of the Rule. The Supreme Court agreed, and an opinion and order dated July 16, 1975, vacated all the trial court's orders subsequent to May 31, 1975, which included the order setting aside the jury verdict and the judgment of acquittal. See *State ex rel. Dawson v. Superior Court,* 112 Ariz. 123, 538 P.2d 397 (1975). The Supreme Court also allowed a specified period to file any motions under Rule 24, Rules of Criminal Procedure.

After an abortive attempt to receive relief in the federal court, defendant was sentenced and on the same date made a motion under Rule 24.2(a)(3) to vacate the judgment, on the ground that his conviction was obtained in violation of the due process clause of the Fourteenth Amendment of the United States Constitution and the Constitution of the State of Arizona because there was no relevant evidence as to sanity. On the basis of *State v. White,* 110 Ariz. 508, 520 P.2d 1132 (1974), the trial court ruled that because of the state's failure to prove sanity by relevant evidence the issue having been raised, the defendant's subsequent conviction constituted a denial of due process of law and therefore granted defendant's motion to vacate the judgment. The state appeals from this order.

The testimony adduced at trial shows that shortly after 1:00 a. m. on February 1, 1975, one Jeff Harris saw defendant roughing up a 10 year-old boy on the porch outside the Gay 90's Bar in Payson, Arizona. When defendant started to shake the boy's head by his hair in spite of Harris' objection, Harris pulled defendant's hand away. Defendant then swung at him. Defendant's friend, Doug Shearer, jumped on Harris when Harris struck back at defendant but Shearer was pulled off by Harris' friend, Dwayne Kaufmann. In the meantime, defendant and Harris were fist fighting for one or two minutes between the cars and trucks in a parking lot when they were pushed apart and Harris turned away. Dale Pennington, a friend of Harris, was also briefly involved in this fight. Defendant then said, "Fuck it, I'm going to waste the muthafucker" and attacked Harris with a knife. He slashed Harris across

the face cutting to the bone and creating a wound which required 40 stitches.

Harris thereupon retreated, first protecting himself by tossing gravel, and then with the help of Dale Pennington. Defendant then briskly and directly proceeded, knife drawn, to where Dwayne Kaufmann and Shearer were fighting in a ditch. When Kaufmann jumped up shouting "No knives", defendant slashed across Kaufmann's throat with a knife. Kaufmann retreated out of the ditch and as he reached the top, he saw Bill Price (the homicide victim), who had just walked across the parking lot. Kaufmann shouted, "Bill, get the hell out of here, they've got knives" but instead Price moved toward Kaufmann. Defendant then attacked Price, producing slash cuts across his face and neck. Price backed up with his hands over his face and defendant attacked him on his right side. The fatal injury to Price was a stab wound under his right armpit which severed an artery. Price staggered back to his truck in the parking lot and collapsed. As Mark Kaufmann (Dwayne's brother) knelt over Price and tried to stop Price's bleeding, defendant stabbed Mark in the throat.

Shearer heard someone say that they were going to get guns and he then said to defendant "Tom, we've got to get out of here". Both defendant and Shearer took off running. Defendant got to Shearer's truck first and was waiting in the passenger side when Shearer arrived. They tried to depart in the truck but a witness to the fight, Donald Lusk, cut off their escape route with his pickup truck and forced Shearer's truck into a ditch. Defendant dismounted from Shearer's truck and began to unsheath a rifle. At that point Lusk retreated by backing his truck away. Approximately three hours later defendant and Shearer were arrested by sheriff's deputies. One of the deputies testified that he did not notice anything unusual about defendant's face except for a cut on the side of his nose. A picture of him taken on February 1, showed no evidence of facial bruises or swelling other than the cut on the side of his nose.

Testifying on behalf of defendant were three psychiatrists who all were of the opinion that at the time of their examination, approximately two months after the incident, defendant was suffering from no psychiatric disorder of any kind and was perfectly normal.

Dr. Maier Tuchler testified that defendant was unable to recount in detail the events which transpired after he was ordered to let go of the child. He came to the conclusion that defendant had memory amnesia, the source of which might have been concussion, excessive alcohol abuse or panic. He did not believe it was induced solely by alcohol. He stated that his opinion, based upon the hospital records and his examination of defendant, was confirmed by the hypothetical question posed by defendant's attorney at trial. Dr. Tuchler concluded that because of defendant's emotional state and amnesia which was a part of his emotional state and caused by a combination of the emotions, alcohol and concussion, he did not believe that defendant had the ability to tell right from wrong at the time of the incidents. He testified that among the details which were important in arriving at his conclusion was the fact that, according to his information, defendant did not provoke a fight and handled his knife in a defensive manner. He concluded that defendant handled his knife in a defensive manner because the victims were slashed, which is a defensive thrust, as opposed to stabbing which is an aggressive thrust.[1]

Dr. Otto Bendheim testified that he examined the defendant on April 19, 1975 at the Arizona State Hospital. He took a psychiatric history and performed a mental status examination. He found that defend-

---

1. The medical examiner testified, contrary to the doctor's conclusions, that the victim had suffered 11 wounds some of which were *stab* wounds including the fatal thrust which was 4 inches deep.

ant was able to describe in some detail the events of February 1, 1975, but there were gaps where his memory failed him. Based upon his examination he felt that defendant had true memory amnesia. He admitted that when he filed his original report he had no firm opinion on the subject but was able to give an opinion in court based upon the hypothetical question posed by defendant and his assumption that defendant had a cerebral concussion. He admitted that if some of the facts were changed, his opinion would be different. He stated that in his opinion he gave great weight to the facts stated in the hypothetical question which assumed that defendant was held by the hair and bent backwards over the hood of a vehicle by two persons while a third person struck him repeatedly in the face. He also gave great weight to the assumption that defendant had a concussion and a broken nose. Dr. Bendheim admitted that the objective way to determine whether a person is suffering from a concussion is to examine the person at the time of the injury. He further admitted that when a person has a concussion his coordination and dexterity may be impaired. He clearly admitted that his testimony depended upon the hypothetical question being correct.

Dr. Harrison Baker, director of Forensic Psychiatry at the Arizona State Hospital, also examined defendant. He found that defendant had some recollection or ability to recall, in a rather spotty fashion up to a certain point, the events that occurred but that he had a blank period or a lack of memory for events which subsequently occurred. He stated that this amnesia continued to exist at the present time. Over the state's objection he testified that he had hypnotized defendant in order to determine whether defendant was telling him the truth as far as his memory was concerned and that the hypnosis confirmed his already-formed conclusion, to wit, defendant had memory amnesia which occurred as a result of a blow during the fight and therefore was not legally responsible for his acts. Dr. Baker was presented with essentially the same hypothetical question presented to the other two psychiatrists and, based upon the hypothetical, concluded that defendant did not know the nature and consequences of his acts at the time. Dr. Baker disagreed with Dr. Bendheim in that he did not attribute any of the amnesia to the fact that defendant had been drinking or that he had had an emotional confrontation.

All the psychiatrists felt that defendant was not faking his amnesia.

The lay testimony that was offered on the issue of insanity consisted of testimony of defendant's friends and his mother. One witness testified that defendant had a blank, dazed look on his face at the time of the incident. Another one stated he looked confused. Still another characterized his facial expressions as distant and scared. Another testified:

"Q. Did you say anything to Tom Allen during the period of time that you were close to this fight?

A. Yes I did. I said, Tom, put away the knife and get out of here. I said it a lot of times.

Q. Did you say anything else to him?

A. I said, 'You guys are crazy'.

Q. Did Tom respond to you in any way?

A. No, he didn't. No he dildn't at all. When he ran from there across the street I was only four feet away from him when I said it and he was just wild eyed and went right across the street.

     *     *     *     *     *     *

Q. What was the expression on his face?

A. It was just distant. He didn't even hear me. The expression on his face was just wild, wild expression."

His mother testified that defendant had been in Vietnam, that after he came home he had periods of depression, and that maybe once every nine weeks or so he would have nightmares and awake in the

middle of the night shouting "The gooks, the gooks".[2] She also stated that he went to see a psychiatrist but stopped going because it was too expensive.

The general rule in Arizona is that a defendant is presumed to be sane, but when he introduces sufficient evidence to raise a doubt as to his insanity under the M'Naghten Rule, it becomes the state's burden to prove his sanity beyond a reasonable doubt. *State v. Sisk,* 112 Ariz. 484, 543 P.2d 1113 (1975). When a criminal defendant presents expert testimony to the effect that he was legally insane at the time of the crime, the presumption of sanity does not vanish. As stated by our Supreme Court in *State v. Daniels,* 106 Ariz. 497, 478 P.2d 522 (1970):

> "If a defendant introduces sufficient evidence to raise a doubt as to his sanity under the Rule of M'Naghten the burden of the State is to establish beyond a reasonable doubt the converse. [citations omitted] In its efforts to do so, the State is aided by the presumption of sanity since statutory presumptions do not vanish as do presumptions of law or fact. [citation omitted]
>
> \* \* \* \* \* \*
>
> Whether a doubt was raised in the minds of the jury to rebut the presumption of sanity cannot be determined by the court. The weight to be given the evidence is a question for the jury." 106 Ariz. at 502, 478 P.2d at 526.[3]

We do not believe that the lay testimony in this case, standing alone, raised the defense of insanity. It is clear that the insanity defense rested upon the testimony of the expert witnesses. The case of *State v. White,* supra, does not stand for the proposition that if the state fails to introduce psychiatric testimony to counter the psychiatric testimony of the defense, the defendant must be acquitted. The most that *White* stands for is that under the facts as presented the state failed to sustain its burden of showing the sanity of defendant beyond a reasonable doubt.

The long-standing rule to be applied is set forth in Udall On Evidence, Sec. 26:

> "The opinions of experts are received in order to assist the trier of fact in its search for the truth, and the trier has the sole right to determine what weight and effect will be given any particular evidence in the case, and in the usual situation the jury may accept or reject, in part or in toto, the testimony and opinions of an expert, even though uncontradicted. But if the field of the expert evidence is within the exclusive province of specialists' study, and outside the common knowledge of laymen, and if there is nothing intrinsic in the evidence to cast suspicion upon it, then the trier of fact may not arbitrarily reject it." (Footnotes omitted)

An example of the foregoing principles occurs in the case of *State v. Schantz,* 98 Ariz. 200, 403 P.2d 521 (1965). In that case, the same Dr. Maier Tuchler who testified in the case sub judice was called by the defendant. He testified that he had examined defendant on numerous occasions since the offense and was of the opinion that the defendant, at the time of the offense, did not know the nature or significance of his acts and did not know right from wrong. He further testified that defendant had total amnesia for the events related to the homicide and that his efforts to bring back defendant's memory were unsuccessful; that an amnesia state exists where the emotional state predominates without the conscious awareness of the individual; and that actions in such a state are outside the person's deliberate volitional conscious awareness. At the conclusion of the evidence the defendant moved for a directed verdict of acquittal. The motion was granted as to the charge of first degree murder and denied as to second de-

---

2. There was evidence that defendant was in an aviation maintenance unit in Vietnam but no evidence that he ever saw combat.

3. See also, *State v. Knaubert,* 27 Ariz.App. 53, 550 P.2d 1095 (1976).

gree and manslaughter. On appeal, our Supreme Court observed that the issues of deliberation and premeditation arising out of the charge of first degree murder could have been submitted to the jury since the jury was not compelled to accept the uncontradicted opinion testimony of an expert.

In *State v. Daniels,* supra, the defendant's principal contention on appeal was that having offered expert testimony that he was not sane at the time of the act in question he must be absolved of criminal responsibility since the state failed to put on expert testimony to show that he knew the nature and quality of his act and that his act was wrong. The court, in rejecting this contention, quoted from *State v. Cano,* 103 Ariz. 37, 436 P.2d 586 (1968):

> " * * * Expert-opinion testimony is merely evidence to be considered by the jury, together with all the facts and circumstances in the case. * * *

> The law has not yet been able to develop a perfect standard by which legal responsibility for crime is to be determined. See *State v. Schantz,* supra. It is for this reason that the function of the jury becomes of even greater importance in cases where insanity is raised as a defense. * * *" 103 Ariz. at 41, 42, 436 P.2d at 590.

*State v. White,* supra, does not overrule any of these earlier Arizona decisions.

The hypothetical question posed to all of the psychiatrists contains facts which were in dispute and contradicted by other evidence. Among these disputed facts were the following: (1) Pennington struck defendant five times squarely in the face; (2) defendant was held by the hair and bent backwards over the hood of a vehicle by two persons while a third person struck him repeatedly in the face; (3) defendant's nose was smashed; (4) defendant was bleeding profusely; (5) defendant had a blank or dazed expression on his face; (6) defendant had a cerebral concussion at the time of the altercation. In *Mims v. United States,* 375 F.2d 135, 143–144 (5th Cir. 1967) the Court states:

> "It has been recognized that expert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant's lack of cooperation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross examination of the expert may be such as to justify the trier of facts in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony; and in determining whether such issue is raised, due consideration must be given to the fact that the trier of facts has the opportunity to observe the witness if he testifies in person." (footnotes omitted)

Dr. Bendheim clearly based his testimony on an assumption that the facts stated in the hypothetical question were true. As noted above, there was a factual dispute as to these facts and the jury, in determining what were the true facts, could well be justified in rejecting the testimony of Dr. Bendheim.

As for Drs. Tuchler and Baker, they stated that the hypothetical question merely confirmed a conclusion at which they had already arrived. However, it is clear that both Drs. Tuchler and Baker had to rely on the truthfulness of defendant's statement that he did not recollect the events. If it were not for the fact that defendant stated he did not remember what had hap-

pened there would have been no diagnosis of memory amnesia and no conclusion of legal insanity at the time of the incidents. Furthermore, both doctors based their opinion on a conclusion that defendant had suffered a concussion, a conclusion which they arrived at from facts contained in the hospital records which facts were in dispute. Both doctors expressed the opinion that defendant was telling the truth when he said he could not remember the events. The jury was not bound by this opinion since it could have believed that the doctors' expertise in other matters did not qualify them as better judges of credibility than the jury members themselves.

■ Dr. Baker claimed that he verified defendant's truthfulness by placing him under hypnosis and stated that people under hypnosis always tell the truth.[4] The jury was not bound to believe Dr. Baker's unsupported conclusion as to the reliability of hypnosis. Vol. 9 of the Encyclopaedia Britannica (1974) at pg. 139 on the subject of hypnosis states:

"Hypnosis has not been found reliable in obtaining truth from a reluctant witness. Even if it were possible to induce hypnosis against one's will, it is well documented that the hypnotized individual still can willfully lie."[5]

It is interesting to note that the hospital records, admitted into evidence, contained a report of an interview made by a psychiatric social worker at the Arizona State Hospital. This report states that defendant was reluctant to volunteer information because "I don't want to say anything that might mess me up in court under my lawyer's advise [sic]." She also noted that although defendant claimed not to remember anything after the first blow, he did remember being held against a car and beaten by four men.

■ The expert's opinion is not stronger than the facts which support it and the explanation of its basis. *Dwyer v. Ford Motor Company*, 36 N.J. 487, 178 A.2d 161 (1962); *Parker v. Goldstein*, 78 N.J. Super. 472, 189 A.2d 441 (1963).

■ There is substantial evidence in this case from which the jury could have concluded the testimony of Drs. Tuchler and Baker was naive and not worthy of belief.

■■ Defendant claims that the prohibition against double jeopardy prevents us from setting aside the order of the trial court. We do not agree. The comment to Rule 24.2 of the Rules of Criminal Procedure, indicates that the motion to vacate judgment takes the place of the motion in arrest of judgment which appeared under the old rule. An order granting a motion in arrest of judgment is appealable by the state under A.R.S. Sec. 13–1712(3). The underlying premise of double jeopardy is that a defendant should not be twice tried or punished for the same offense. Where there is no threat of multiple prosecution the double jeopardy clause is not offended.

In *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975) the history and principles of the double jeopardy clause are thoroughly discussed. In *Wilson* the defendant was found guilty by a jury of converting union funds in violation of a federal statute. The court on a post-verdict motion dismissed the indictment. The United States Supreme Court held that when a judge rules in favor of the defendant after a guilty verdict has been returned by the trier of fact the government may appeal without running afoul of the double jeopardy clause since, if the government prevails, the effect would be to reinstate the guilty verdict and there

---

4. There is a question about the admissibility of the results of hypnosis when used not as a diagnostic test but in order to determine the subject's veracity. See Annot. 41 A.L.R. 3d pp. 1369 et seq.

5. This article was co-authored by Dr. Martin T. Orme, M.D., Professor of Psychiatry & Director of Unit for Experimental Psychiatry, University of Pennsylvania and A. Gordon Hamner, Professor of Psychology, MacQuarie University, North Ryde, Australia.

will not be a second trial. As stated in *Wilson:*

> "Although review of any ruling of law discharging a defendant obviously enhances the likelihood of conviction and submits him to continuing expense and anxiety, a defendant has no legitimate claim to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact." 420 U.S. at 345, 95 S.Ct. at 1023

The order granting the motion to vacate the judgment of guilt and the sentences entered on December 19, 1975, is vacated and set aside.

KRUCKER and HATHAWAY, JJ., concur.