#23753-a-JKM

**2007 SD 1**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THE PEOPLE OF THE STATE OF
SOUTH DAKOTA, IN THE INTEREST OF
J.M.J., MINOR CHILD AND CONCERNING,
J.J. AND D.J., PARENTS AND RESPONDENTS

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JANINE M. KERN
Judge

\* \* \* \*

PATRICK M. GINSBACH
HEATHER M. SUDBECK of
Farrell, Farrell & Ginsbach                    Attorneys for appellant
Hot Springs, South Dakota                      child.


LAWRENCE E. LONG
Attorney General


STEVEN R. BLAIR
Assistant Attorney General                     Attorneys for appellee
Pierre, South Dakota                           state.

\* \* \* \*

CONSIDERED ON BRIEFS
ON OCTOBER 2, 2006

OPINION FILED **01/03/07**

#23753

MEIERHENRY, Justice

[¶1.]      In a juvenile proceeding, the trial court adjudicated sixteen-year-old J.M.J. (J.J.) a delinquent child based upon a charge of rape in the first degree. J.J. claims that the adjudication should be reversed because his statements to law enforcement should have been suppressed and because there was insufficient evidence to support a finding of rape in the first degree. Specifically, J.J. claims that the deputy who questioned him about the alleged rape failed to inform him that he could be tried as an adult. Without this warning, he claims that he could not have made a knowing and voluntary waiver of his right against self-incrimination.

[¶2.]      The circumstances leading up to J.J.'s interrogation began when Deputy Steve McMillin (McMillin) of the Fall River County Sheriff's Office was called to Rapid City Regional Hospital to investigate allegations that sixteen-year-old J.J. had raped his three-year-old niece. McMillin took a statement from the niece's mother and then retrieved the niece's clothing for purposes of investigation. McMillin drove to J.J.'s residence, arriving between 2 a.m. and 3 a.m. In J.J.'s Mother's presence, he questioned J.J. after advising him of his constitutional rights under *Miranda*. McMillin read the rights from a pre-printed card, which included an instruction for additional advisement when questioning a juvenile. The card instructed officers to "inform the juvenile that there is the possibility that he/she may be tried as an adult and that any statements made during questioning can be used against him/her in an adult proceeding." For reasons unknown, McMillin did not follow the card's direction to provide the additional advisement. Subsequently,

J.J. waived his rights and answered questions for approximately twenty-five minutes, during which he denied the allegations. McMillin then took J.J. into custody and escorted J.J. to the patrol car. Alone with McMillin on the way to the patrol car, J.J. asked McMillin, "if I did tell what I did, do I have to still go in?" McMillin told J.J. that if he had done something, McMillin needed to know. J.J. then told McMillin that he did it and, thereafter, repeated his confession in the presence of his Mother.

[¶3.] Subsequently, the State filed a petition alleging that J.J. was a juvenile delinquent because he had committed the crime of first degree rape, or in the alternative, sexual contact with a child under sixteen years of age. Initially, the State gave notice of its intention to transfer the matter to adult court but decided not to because J.J.'s psychological evaluation indicated that he could potentially be rehabilitated in the juvenile justice system.

[¶4.] Prior to adjudication, J.J. filed a motion to suppress any statements made to law enforcement at the time of his arrest because McMillin had failed to advise him that he could be tried as an adult. The court denied the motion. The juvenile court ultimately adjudicated J.J. a delinquent child and remanded him to the custody of the Department of Corrections. J.J. appeals, claiming the trial court erred by failing to suppress his statements to law enforcement. He also claims that the evidence was insufficient to adjudicate him as a delinquent.

## STANDARD OF REVIEW

[¶5.]     Whether a statement is voluntarily given is a question of law which we review de novo. State v. Holman, 2006 SD 82, ¶13, 721 NW2d 452, 456. Our standard of review is set forth as follows:

> "Although there are often subsidiary factual questions deserving deference, the voluntariness of a confession is ultimately a legal question." State v. Tuttle, 2002 SD 94, ¶20, 650 NW2d 20, 30 (citing Miller v. Fenton, 474 US 104, 116, 106 SCt 445, 452-53, 88 LEd2d 405, 414-15 (1985) (additional citations omitted)). This Court reviews the entire record and makes an independent determination of voluntariness. *Id.* (citing Beckwith v. United States, 425 US 341, 348, 96 SCt 1612, 1617, 48 LEd2d 1, 8 (1976) (additional citations omitted)). The State must establish the voluntariness of a confession by a preponderance of the evidence. *Id.* ¶21 (citing Nix v. Williams, 467 US 431, 444, 104 SCt 2501, 81 LEd2d 377, n5 (1984)).

*Holman*, 2006 SD 82, ¶13, 721 NW2d at 456. Even if the juvenile's confession is involuntary, it may "not constitute reversible error if the State can prove the error was harmless beyond a reasonable doubt." *Id.* ¶25 (citing Arizona v. Fulminante, 499 US 279, 296, 111 SCt 1246, 1257, 113 LEd2d 302 (1991)).

[¶6.]     Our review of the sufficiency of the evidence is de novo. State v. Tofani, 2006 SD 63, ¶35, 719 NW2d 391, 400. "We will not reverse the trial court's denial of a motion for judgment of acquittal or reverse the guilt determination of the trier of fact if we conclude that 'the State presented sufficient evidence on which the [court] could reasonably find the defendant guilty of the crime charged.'" *Id.* (quoting State v. Guthrie, 2001 SD 61, ¶47, 627 NW2d 401, 420).

## DECISION

**1. Whether the trial court erred in finding that J.J.'s admissions were voluntary even though he was not advised of the possibility that his statements could be used against him in adult court.**

*Per se Rule vs. Totality of Circumstances Analysis*

[¶7.]     J.J. claims that McMillin's failure to advise him of the possibility that he could be tried as an adult when advising him of his right to remain silent violated his constitutional rights. He claims that without this advisement, the State could not establish that he made a clear and intelligent waiver of his right to counsel and right against self-incrimination. He relies on *State v. Lohnes,* 324 NW2d 409 (SD 1982). J.J. claims that *Lohnes* established a per se rule that a juvenile's confession cannot be found to be voluntary without the juvenile first being advised that he could be tried as an adult. The State argues that the absence of this warning should only be a factor considered in the totality of circumstances analysis when evaluating the voluntariness of a child's confession.

[¶8.]     We take this opportunity to re-examine our holding in *Lohnes. Id.* In *Lohnes*, this Court said:

> We now hold that a juvenile is afforded additional, not less, protection of his constitutional rights and before a trial court can conclude that a juvenile has made a clear and intelligent waiver of his rights to counsel and against self-incrimination, the state shall have to establish that he was advised that there was a possibility that he may be tried as an adult.

*Id.* at 414-15.

[¶9.]     *Lohnes* involved a sixteen-year-old juvenile who was tried as an adult for third degree burglary, grand theft and first degree murder. *Id.* at 411. The

-4-

police initially took Lohnes into custody for questioning about a stolen pickup. *Id.* at 410. Soon after beginning to question Lohnes, the police realized he was a juvenile. *Id.* Nevertheless, the police continued questioning him for several hours without contacting a parent or guardian. *Id.* *Miranda* warnings were given; however, the juvenile was not asked if he wished to waive the rights when he admitted to committing burglary and theft and that he was an escapee from the state training school. *Id.* The next day, after learning that the driver of the pickup was murdered, the police again questioned Lohnes. *Id.* at 411. Lohnes's court services officer became aware that the juvenile was a murder suspect and attempted to schedule a court hearing for that same day. *Id.* The police manipulated a delay in the hearing so that they could continue to question the juvenile without an attorney or parent, arranging instead to have another police officer serve as the child's guardian during the questioning. *Id.* The interrogating officer again read the *Miranda* rights to the juvenile. *Id.* Without asking if he wished to waive the rights, the officer continued to question the juvenile until he confessed. *Id.*

[¶10.]     The juvenile moved to suppress his confession based on grounds that the deliberate delay in bringing him to court deprived him of an attorney and on the grounds that his confession was not voluntary based upon the totality of the circumstances. *Id.* Although the deliberate delay issue had not been preserved for appeal, the *Lohnes* Court, nevertheless, considered it under the plain error rule since evidence of the deliberate delay was presented at the suppression hearing. *Id.* at 413. Based on the deliberate delay and the failure to inform the juvenile that he

could be tried as an adult, the Court determined that the confession should have been suppressed. *Id*. at 414.

[¶11.] The *Lohnes* pronouncement that a juvenile must be told of the possibility of being tried as an adult before a confession can be considered voluntary cited to the following three cases from other jurisdictions: *State v. Cano*, 436 P2d 586 (Ariz 1968); *State v. Loyd*, 212 NW2d 671 (Minn 1973); and *Theriault v. State*, 223 NW2d 850 (Wis 1974). An analysis of the three cases, however, reveals that they do not support the per se rule and all three jurisdictions embrace the totality of the circumstances analysis. *See In re* Andre M., 88 P3d 552 (Ariz 2004); State v. Ouk, 516 NW2d 180 (Minn 1994); *In re* Jerrell C.J., 699 NW2d 110 (Wis 2005). We are aware of only two other jurisdictions that have adopted the per se rule: Missouri and New Hampshire. State v. Simon, 680 SW2d 346 (Mo 1984); State v. Benoit, 490 A2d 295 (NH 1985). The majority of jurisdictions apply the totality of circumstances analysis approved by the United States Supreme Court in *Fare v. Michael C.*, 442 US 707, 99 SCt 2560, 61 LEd2d 197 (1979).[1] The juvenile in *Fare*

---

1. States that have expressly rejected a per se rule requiring that a juvenile be warned of the possibility of adult prosecution include: Alaska, Watkinson v. State, 980 P2d 469, 472-73 (AlaskaCtApp 1999) (identifying New Hampshire and South Dakota as the only two states to impose this requirement); Connecticut, State v. Perez, 591 A2d 119, 123-24 (Conn 1991); Delaware, Marine v. State, 607 A2d 1185, 1197; North Carolina, State v. Taylor, 496 SE2d 811, 816 (NCCtApp 1998); Oklahoma, J.D.L., Jr. v. State, 782 P2d 1387, 1390 (OklaCrimApp 1989); Rhode Island, State v. Campbell, 691 A2d 564, 567 (RI 1997); and Tennessee, State v. Callahan, 979 SW2d 577, 582 (Tenn 1998).

   Some states that have declined to adopt a per se rule have found that the nature of the offense and the custodial nature of the interrogation may allow the juvenile to infer that he may be tried as an adult. *See* Quiriconi v. State,

(continued . . .)

#23753

argued that his request to speak with his probation officer during police interrogation constituted a per se request to remain silent. *Id.* at 723, 99 SCt at 2571. The Court rejected the per se rule, explaining the adequacy of the totality of the circumstances approach as follows:

> This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits-indeed, it mandates-inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id.* at 725, 99 SCt at 2572. Except for the per se requirement of *Lohnes,* generally, we have analyzed the voluntariness of a juvenile's confession based upon the totality of the circumstances. *See* State v. Horse, 2002 SD 47, ¶13, 644 NW2d 211, 218; State v. Caffrey, 332 NW2d 269, 272 (SD 1983).

[¶12.]     Of course, any analysis presupposes that *Miranda* warnings have been given. The United States Supreme Court explained the necessity of the warnings and noted,

> [f]or those unaware of the privilege, the warning is needed simply to make them aware of it – the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. . . . Further, the

_____

(. . . continued)
    616 P2d 1111, 1114 (Nev 1980); State v. Gullings, 416 P2d 311, 313-14 (Or 1966); State v. Luoma, 558 P2d 756, 761-62 (Wash 1977).

-7-

> warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it.

*Miranda v. Arizona*, 384 US 436, 468, 86 SCt 1602, 1624-25, 16 LEd2d 694, 707 (1966). The required warnings serve as a safeguard against an atmosphere dominated by custodial police-interrogation, which "creates compelling pressures undermining the will to resist, compelling suspects to speak where they would not otherwise do so voluntarily." *Horse*, 2002 SD 47, ¶12, 644 NW2d at 218 (citing *Miranda*, 384 US at 467, 86 SCt at 1624).

[¶13.] Juveniles are also afforded these safeguards. *In re* Gault, 387 US 1, 13, 87 SCt 1428, 1436, 18 LEd2d 527, 538 (1967). As the Court stated, "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." *Id*. In providing this protection for juveniles, the Court recognized that juvenile court proceedings often "deal with many cases involving conduct that can lead to incarceration or close supervision for long periods, and therefore juveniles often need the same safeguards that are granted to adults." *Id*. at 1450, n65 (quoting Nat'l Crime Comm'n Report, pp 86-87).

[¶14.] We have acknowledged that because of the immaturity and vulnerability of children, their right against self-incrimination is of utmost importance. We said in *Horse*:

> The youth of an accused is a significant factor in determining the voluntariness of a confession. *A juvenile's constitutional right against self-incrimination should be afforded additional protection.* If counsel is not present when an admission is obtained, a court must take great care to assure that the juvenile's confession was voluntary, "in the sense not only that it was not coerced or suggested, but also that it was not the

> product of ignorance of rights or of adolescent fantasy, fright, or despair."

2002 SD 47, ¶12, 644 NW2d at 218 (quoting *Caffrey*, 332 NW2d at 272 (emphasis added)).[2] The young mind may lack the sophistication, knowledge or maturity to understand the ramifications of an admission. Thus, we require law enforcement to explain the child's rights prior to interrogation and to determine if those rights have been waived before proceeding. "*Miranda* warnings safeguard the privilege against self-incrimination during 'incommunicado interrogation of individuals in a police-dominated atmosphere.'" *Horse*, 2002 SD 47, ¶12, 644 NW2d at 218. The atmosphere of interrogation "creates compelling pressures undermining the will to resist, compelling suspects to speak where they would not otherwise do so voluntarily." *Id.* "Children can be 'easy victim[s] of the law,' so [a court must] take special care to scrutinize the record when juveniles are involved." *Id.* ¶12 (citing Haley v. Ohio, 332 US 596, 599, 68 SCt 302, 303-04, 92 LEd 224, 228 (1948)).

---

2.    A recent law review article by Kenneth J. King, entitled, "Waving Childhood Goodbye: How Juvenile Courts Fail to Protect Children From Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights," cited several studies which analyzed whether juveniles understood the meaning of *Miranda* warnings. 2006 WisLRev 431, 433. According to one such study, only 21% of children, compared to 42.3% of adults, were able to comprehend the meaning and significance of *Miranda* warnings. *Id.* Of these children, 55% could not understand at least one component of the Miranda warnings compared to 23% of adults. *Id.* Compounding this problem, King also noted that the children that make up the juvenile justice system are much more likely as a whole to have mental illnesses, substance abuse problems, or learning disabilities. *Id.* at 443-44. These studies suggest that, "a juvenile's vulnerability and immaturity place him at a greater disadvantage than an adult when dealing with police," demonstrating the need for greater protection for a juvenile's Fifth Amendment rights. *Id.* at 455.

[¶15.]     What we have said in these prior cases concerning the scrutiny to be applied in determining whether a juvenile's statements are voluntary still holds. However, we are prepared today to retreat from the per se rule espoused in *Lohnes*. We, therefore, join the majority of jurisdictions that apply the totality of circumstances analysis. The United States Supreme Court noted that a totality of the circumstances analysis "refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation." *Fare*, 442 US at 725-26, 99 SCt at 2572. Although we still adhere to our statement in *Lohnes* "that a juvenile is afforded additional, not less, protection of his constitutional rights," we no longer approve of the per se rule. 320 NW2d at 414. Instead, the voluntariness of a confession should be determined based on an analysis of the totality of the circumstances. Advisement that the juvenile could be tried in adult court is a significant factor in that analysis. As Justice Konenkamp wrote in reference to the importance of the presence of a parent or guardian during questioning,

> [W]hile we do not hold that a juvenile has a *per se* right to consult with a parent, guardian, or custodian before questioning or to have such persons present during questioning, we do hold that notice to a parent, guardian, or custodian and a child's opportunity to confer with such persons are significant factors in evaluating the voluntariness of a statement or confession under the totality of the circumstances.

*Horse*, 2002 SD 47, ¶26, 644 NW2d at 224.

[¶16.]     Thus, we hold that advisement of the possibility of being tried as an adult, although not a per se rule, is "a significant factor in evaluating the

voluntariness of a statement or confession under the totality of the circumstances." *Id.* However, where a juvenile is not advised that he could be tried as an adult, courts should proceed with caution and consider the juvenile's confession under the backdrop that "a juvenile's constitutional right against self-incrimination should be afforded additional protection." *Horse*, 2002 SD 47, ¶12, 644 NW2d at 218.

[¶17.] The advisement is especially warranted where the juvenile is charged with a crime that falls under SDCL 26-11-3.1. Since 1997, South Dakota law has mandated that delinquents who commit certain crimes shall be tried as adults.[3] SDCL 26-11-3.1. The relevant portion of the statute provides: "Any delinquent child sixteen years of age or older against whom Class A, Class B, Class C, Class 1, or Class 2 felony charges have been filed shall be tried in circuit court as an adult." *Id.* Furthermore, when a delinquent requests a transfer hearing, the statute establishes a "rebuttable presumption that it is in the best interest of the public that any child, sixteen years of age or older, who is charged with a Class A, Class B, Class C, Class 1, or Class 2 felony, shall be tried as an adult." *Id.*

[¶18.] Under the mandates of SDCL 26-11-3.1, the possibility of a juvenile being tried in adult court is presumed. As the possibility that the juvenile may be tried as an adult becomes more probable, the juvenile should understand that one of the consequences of waiving his rights is that his statements could be used against him in adult court. As the officer's pre-printed *Miranda* card directed, law

---

3. The legislature recently added Class C felonies to the list of felonies that automatically require delinquents to be tried as adults. 2006 SD Laws ch 117 section 5.

enforcement officers should take this precautionary step, especially where the juvenile has committed a crime enumerated in SDCL 26-11-3.1.

[¶19.] The State argues that the absence of such a warning should only be considered when the juvenile is actually tried as an adult. The State, however, cites no authority for its argument. An inquiry of voluntariness requires a determination that the child's statement "was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair." *Caffrey*, 332 NW2d at 272 (internal quotations and citations omitted). An invalid waiver of *Miranda* rights is not cured simply because the proceedings are juvenile in nature. *See In re* Gault, 387 US at 47-48, 87 SCt at 1454-55 (stating that delinquency proceedings are criminal for purposes of the Fifth Amendment). The purpose of the right against self-incrimination "is to prevent the state, whether by force or by psychological domination, from overcoming the mind and will of the person under investigation and depriving him of the freedom to decide whether to assist the state in securing his conviction." *Id*. at 47. Thus, we turn to our review of the lower court's decision.

*Voluntariness under Totality of Circumstances Analysis*

[¶20.] In this case, the trial judge declined to follow the per se rule of *Lohnes* and considered whether J.J.'s confession was voluntary based on a totality of the circumstances analysis. However, in applying the totality of the circumstances analysis, it is unclear whether the judge considered failure to warn of the possibility of adult prosecution as a factor. Another problem in this case is that information concerning J.J.'s learning disabilities and the effect of not being told he could be

tried as an adult did not surface until the adjudication and disposition hearings. For example, during the adjudication hearing, Mother first testified about J.J.'s delayed development and that she would not have agreed to the interview had she known that J.J. could have been tried as an adult. Similarly, information that J.J. had an IQ of 79, was diagnosed with Attention Deficit Hyperactivity Disorder and was on an Individual Education Plan came through testimony in the adjudication and disposition hearings. The only witness at the suppression hearing was Deputy McMillin. He testified that he went to J.J.'s residence at about 2:30 or 3:00 a.m. He knocked on the door and J.J.'s mother answered. He then explained "what was going on and that [he] needed to speak to J.J. about the incident." He asked her permission to speak with J.J. She agreed and awoke J.J. During the questioning, McMillin stood in the entry while J.J. and Mother sat at a table in front of him. McMillin explained to them "that no matter what come [sic] about, that [his] mind had already been made up and there was nothing that was going to change the outcome of the interview." McMillin then read J.J. his *Miranda* rights from a pre-printed card. He read from the card as follows:

> You have the continuing right to remain silent and to stop questioning at any time. Anything you say can be used as evidence against you. You have the continuing right to consult with and have the presence of an attorney. If you cannot afford an attorney, an attorney will be appointed for you. Do you understand your rights? Do you wish to waive your rights and talk to me at this time?

J.J. answered the two questions, "yes." Although the pre-printed card indicated that when questioning a juvenile, the officer should also explain that the child could be

tried as an adult, the deputy admitted he did not read that portion of the card.
Thus, J.J. was not informed that there was the possibility of being tried as an adult.

[¶21.]     During the short interview in the residence, J.J. made no admissions.
The deputy then put J.J. under arrest and collected the clothing J.J. had been
wearing that day. The deputy then explained to J.J. and Mother that he was taking
J.J. to the sheriff's office and would be contacting a judge to decide if J.J. would be
placed in the juvenile detention facility. The deputy then walked J.J. towards the
patrol car, which was parked on the street. On the way to the car, J.J. asked
McMillin, "if I did tell what I did, do I have to still go in?" McMillin responded, "if
you did something, I need to know. I understand it is tough to say certain things in
front of your parents." J.J. then confessed. McMillin testified as follows:

> From there he said, "I did do it. She told me to do it." I said, "a
> three-year-old girl told you to do it?" He said, "yes," and I
> inquired where it was at. He said, "in the Explorer." I asked, "if
> I bring your mom out here, will you explain everything to her?"
> He said he would. So I placed him in the patrol car and went in
> and got his mom."

Mother then came to the patrol car and J.J. told her what had happened. This
taped conversation was introduced into evidence. J.J. asked again if he could stay
with his mother.

[¶22.]     Based on this evidence and briefs submitted by counsel, the judge
decided that the statements were voluntary. In a letter decision, she indicated that
the factors she considered were as follows: "1) the defendant's youth; 2) the
defendant's lack of education or low intelligence; 3) the absence of any advice to the
defendant of his constitutional rights; 4) the length of detention; 5) the repeated and
prolonged nature of questioning; 6) the use of physical punishment such as the

deprivation of food or sleep; 7) the defendant's prior experience with law enforcement and court system; and 8) whether the interrogating officers used deception or misrepresentation." The judge's written decision does not indicate that she took into consideration the factors involving the absence of the warning that he could be tried as an adult and the presence or absence of J.J.'s mother when he made the statements. *See Horse,* 2002 SD 47, ¶26, 644 NW2d at 224. She did, however, mention them in her decision as follows:

> Having considered the totality of the circumstances, the Court determines that J.J.'s consent to interrogation was freely and voluntarily given. J.J. was fifteen years old at the time of his arrest. He was advised of his *Miranda* rights prior to the interrogation, but not of the fact that there was a possibility he could be tried as an adult. He indicated he understood his rights, wished to waive them and speak to Deputy McMillan. No evidence that J.J. is of low intelligence has been presented to the Court. J.J. was questioned for a very short period of time in his own home with his mother present. J.J. was not punished in any way during the interrogation. Also, the Court has been presented with no evidence that Deputy McMillan used deception or misrepresentation to obtain the confession. After J.J. initially refused to speak he then reinitiated the conversation outside his mother's presence and then made incriminating statements. J.J. will be tried in juvenile rather than adult court.

The State had the burden of proving by a preponderance of the evidence that J.J.'s statements were voluntary. *Holman,* 2006 SD 82, ¶13, 72 NW2d at 456. Based on the testimony and evidence presented at the suppression hearing, we cannot say that the trial court erred in finding voluntariness. Evidence of J.J.'s learning disabilities and low IQ and Mother's claim that she would have stopped the interrogation had she been told that J.J. could be tried as an adult may have tipped the scales against voluntariness. However, that evidence was not presented as part

of the motion to suppress. It was not until the adjudicatory hearing that Mother attempted to testify that she did not know or understand during the questioning at the residence that J.J. could have been tried as an adult and that had she known she would not have allowed McMillin to continue questioning her son. The State objected to her testimony and the judge sustained the State's objection because it should have been presented at the suppression hearing. The judge then asked as follows:

> Well, we're in the unique situation where a trial is occurring before the Court. We had a full blown suppression on this. You briefed it as did [the State's Attorney] and there was a significant amount of information that you didn't apparently bring to the Court. Now, you want to revisit this during the middle of an adjudicatory hearing, is that what you're asking the Court to do?
> . . .
> The Court's point is that should have been done at the suppression hearing. Are you asking the Court to reconsider the ruling made at the suppression hearing by evidence now you're garnering at the adjudicatory proceeding?

J.J.'s counsel answered that he did not want the judge to reconsider the suppression ruling and that he only offered the information for the purpose of determining the weight and credibility to give to J.J.'s confession. Counsel's answer was as follows:

> I'm asking you, as trier of fact, to make a determination, when you render your decision, not to give any credibility to those admissions that were made under the circumstances in which they were procured and that's what the jury instruction says, when you look at admissions or confessions, you're supposed to look at them as suspect, as a jury. That's the jury, what they are suppose to do. The reason you look at all circumstances under which they were obtained. So all I'm doing is fleshing out how those are to be determined and what weight you are going to give to those admissions.

[¶23.] A review of the judge's findings reveals that almost all of her findings in determining guilt were based on evidence and testimony other than J.J.'s confession. Of the judge's nineteen findings of fact, only two mention J.J.'s admissions. Her findings in regard to the admissions were as follows:

> 16. That J.J. admitted, in a conversation with Fall River County Deputy Sheriff Steve McMillin and his mother, that [the niece] wanted to know what it felt like if he put "his winker in her dink," and that she wanted him to and that he did do it.
>
> 17. That the Court reduces the weight given to the admission of J.J. because of the testimony that J.J. is enrolled in an Individual Education Program at the Edgemont School and that he is two years behind as he was not allowed to matriculate immediately from Kindergarten and the fifth grade; however, these grade retentions were a result of J.J.'s maturity levels and not a result of his inability to read, write or communicate.

None of the other findings of fact upon which the judge based her adjudication depended on or were a result of J.J.'s statements. The findings were based on the testimony of the doctor that examined the niece, statements made by the niece to her mother and others, and photographs of the child's injuries. Even if we were to assume that J.J.'s statements were involuntary, the error was harmless beyond a reasonable doubt because the judge gave reduced weight to the admission and because the evidence supported the adjudication without the admission. *See Holman*, 2006 SD 82, ¶25, 72 NW2d at 459.

### 2. Whether the trial court erred when it found sufficient evidence to adjudicate J.J. a delinquent child.

[¶24.] J.J. also claims that the evidence was insufficient to adjudicate him as a delinquent. We find no merit to his claim. Although he claims there was no corroborating evidence to establish the corpus delecti of the crime, a review of the

evidence shows otherwise. Both the statements of the niece and the medical observation of the doctor establish that a rape occurred and that the perpetrator was J.J. Four pictures of the niece's vaginal area were introduced into evidence which depicted the injuries explained by the doctor. The doctor's observations were that a "rubbing" trauma from the skin being pulled back and forth caused tears along the niece's labia approximately 7-10 mm in length. The doctor testified, based upon the child's demeanor, the spontaneous allegations made by the niece and the results of the exam that a sexual assault had "probably occurred." Additionally, the niece told her mother that J.J. had put his "winker" in her "dink." She complained of burning when she urinated and the photographs showed the redness and trauma to the child's vaginal area.

[¶25.] J.J. also claims that the hearsay statements of the child should not have been considered by the court. The child's statements came in without objection, consequently, this issue was not preserved for appeal. Rogen v. Monson, 2000 SD 51, ¶15, n2, 609 NW2d 456, 460 (stating that the failure to make a timely objection does not preserve the issue for appeal).

[¶26.] Based on our standard of review, we cannot say that the trial judge erred in adjudicating J.J. a delinquent child. We affirm on all issues.

[¶27.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.